GEORGE B. COLLYER, Respondent, *v.* CHARLES S. COLLYER,. Administrator, etc., Appellant.

Before a recovery can be had in an action for use and occupation of real estate, it must be made to appear that the conventional relation of landlord and tenant existed between the parties; and while the possession and beneficial enjoyment of real property, with the consent of the owner, is ordinarily sufficient to sustain an action upon an implied agreement for use and occupation, such an agreement may not be implied where the circumstances attending the use and occupation show clearly there was no expectation of rent by either party.

So, also, where a person lives with a relative as a member. of the family under circumstances showing clearly that there was no expectation on either side that board should be paid, the law will not imply a promise to pay board.

(Argued March 29, 1889; decided April 16, 1889.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made at the December Term, 1887, which affirmed a judgment in favor of plaintiff, entered upon the report of a referee on reference of a disputed claim against an estate.

The facts, so far as material, are set forth in the opinion.

*Calvin Frost* for appellant.    The conventional relation of landlord and tenant must be shown to have existed between the respondent and his sister, in order to render an action for use and occupation maintainable.    (*Williams* v. *Hutchinson,* 3 N. Y. 317; *Preston* v. *Hawley,* 101 id. 588; *Benjamin* v. *Benjamin,* 5 id. 387; *Carpenter* v. *Weller,* 15 Hun, 135; *Lyon* v. *Smith,* 35 id. 275; *Ross* v. *Ross,* 6 id. 184; *Roe* v. *Boyle,* 81

N. Y. 305; *Morey* v. *Pelt*, 88 id. 453; *Townsend* v. *N. Y. Life Ins. Co.*, 4 N. Y. Civ. Pro. R. 398.) A person cannot perform services, intending them to be gratuitous, and with a tacit understanding that no pecuniary charge is to be made, and afterward recover on a *quantum meruit* for such services. (*Moore* v. *Moore*, 3 Abb. Ct. App. Dec. 303; *Bowen* v. *Bowen*, 12 Bradf. 336; *Robinson* v. *Cushman*, 2 Denio, 152; *Everts* v. *Adams*, 12 Johns. 352; *Sharp* v. *Cropsey*, 11 Barb. 224; *Raynor* v. *Robinson*, 36 id. 128; *Green* v. *Roberts*, 47 id. 521; *Wilcox* v. *Wilcox*, 48 id. 327; *Van Kuren* v. *Saxton*, 5 T. & C. 566; *Sullivan* v. *Sullivan*, 6 Hun, 658; *Hewitt* v. *Bronson*, 5 Daly, 1.) If the intestate was liable for use and occupation, there is no proof that there was any demand upon her or any particular time for payment, hence no interest could be charged prior to such date of demand. (*Sellick* v. *French*, 1 Am. Lead. Cas. 626; *Feeter* v. *Heath*, 11 Wend. 486.) The action for use and occupation is alone authorized by statute. (1 R. S. 739, § 26.) The claim under this statute is for damages, which, in the absence of an agreement, must necessarily be unliquidated, and upon such no interest can be allowed. (*White* v. *Miller*, 78 N. Y. 393; *Holmes* v. *Rankin*, 17 Barb. 454; *De Witt* v. *De Witt*, 46 Hun, 258.)

*Richard L. Sweezy* for respondent. There have been cases where claims for board between near relatives have been sustained as upon an implied promise. (*Gilbert* v. *Comstock*, 93 N. Y. 484; *Webster* v. *Nichols*, 21 Week. Dig. 566; *Reynolds* v. *Robinson*, 82 N. Y. 106.) Even a tenant in common renting out the premises is liable to his co-tenants. (*Roseboom* v. *Roseboom*, 15 Hun, 309; *Joslyn* v. *Joslyn*, 9 id. 388; *Coakley* v. *Mahar*, 36 id. 157.) Possession and beneficial enjoyment of real property with permission of the owner is sufficient to sustain an action upon an implied agreement for use and occupation. (*Osgood* v. *Dewey*, 13 Johns. 240; *Coit* v. *Planer*, 4 Abb. Pr. [N. S.] 140; *Baxter* v. *West*, 5 Daly, 460; 1 Cowen's Tr. [2d ed.] 47.) If there was an understanding that plaintiff was to be compensated

by will, then, upon failure of the deceased to leave such will, plaintiff is entitled to recover compensation as a creditor. (*Robinson* v. *Raynor*, 28 N. Y. 494; *Reynolds* v. *Robinson*, 64 id. 589; 82 id. 104.)

EARL, J. Elizabeth Collyer, a sister of the plaintiff, died March 4, 1883, intestate. At the time of her death she was about sixty years of age and had never been married. She left personal estate which was inventoried at about $70,000. The defendant was appointed her administrator and thereafter the plaintiff presented to him a claim against her estate for rent of a house in the city of New York, known as No. 81 Lexington avenue, and for rent of a house in Sing Sing, and for board and other matters, amounting in all to $9,547.91. The claim was disputed by the defendant and was referred by consent of the surrogate. It was thereafter brought to trial before the referee and he allowed for rent of the Lexington avenue house, with interest, $4,457.48, and for rent of the house at Sing Sing, with interest, $660.40, and for board and other items, amounting in all to $5,948.70. The report of the referee was confirmed and judgment entered thereon, and that judgment, upon appeal to the General Term, has been affirmed.

The largest share of the claim allowed was made up of the rent of the two houses mentioned. The claim of the defendant is that his intestate occupied them under such circumstances that she never became liable for any rent, and whether or not that claim is well founded is the principle question to be determined upon this appeal.

The plaintiff and the intestate and their mother lived together as one family in the Lexington avenue house until the decease of the mother in 1865, after which time the plaintiff and the intestate resided alone there, she attending to the household duties without the aid of a domestic, while the plaintiff furnished and paid for all needed supplies. In 1873 the plaintiff married a lady much his junior. Some months after that he and his wife ceased to live in the house, and the intestate resided there alone. The house contained much old furniture,

some of which formerly belonged to plaintiff's mother, and some of it belonged to him and some to the intestate. The furniture was piled up in some of the rooms of the house, and the intestate used but a small portion of it, and occupied but. a small portion of the house. The plaintiff's wife was a witness for him and gave the following description of the Lexington avenue house as she found it in October, 1873, when she went there with her husband to live:

"When I first went to stay at all at the Lexington avenue house, after I was married, there was no furniture visible, except a few broken chairs, and everything else compared with them. The basement had no furniture in it. When I remained there over Saturday night and Sunday we ate in the kitchen in the back basement. That had a very little furniture in it. * * * The front basement had no furniture in it at all; it had no carpet on; a few old broken chairs stowed away. That is all there was on that floor, that I have described, the basement floor. The parlor floor was furnished with three. cane-bottomed chairs and an old carpet and a hair-settee. There were two rooms on the parlor floor. I can't say anything about the front room; the front room was locked. I had no sight of that whatever. * * * The back parlor contained an old rocking-chair, a hair-settee, a mirror, a few pictures; I guess that is all; I only know of one room being furnished on the floor above the parlor. That is the only room on the second floor that I was ever in. It contained a small desk, an apology for a writing-desk, used not very often, occasionally by Mr. Collyer. It also contained a bed and three chairs, no bureau, an old broken washstand — this is the back room. The front room on the second floor was locked all the time I was there. I saw through the door of it a promiscuous gathering of everything — beds, chairs — a sort of junk-shop. I would not say positively there was a bureau; there might have been. When I passed by I could see the things piled up to the ceiling at one end of it. I can't say about the entire room, because I didn't see. I merely saw through a chink. The door stood ajar about six inches. This room, in which the

furniture was piled, was occupied by Miss Collyer. She slept in that room."

Whenever the plaintiff had occasion to go to the city on business of his own he would stop at the Lexington avenue house with his sister. He paid for her groceries and the supplies furnished to the house. She kept no servant and lived in the most parsimonious and penurious way. She occasionally rented some of the rooms in the house, as she said, for the purpose of getting some money. She continued to live in the house, after the marriage of George, until the spring of 1879. There was never any talk between her and him about rent. It does not appear that she requested permission to occupy the house, or that the plaintiff gave her express permission, or that any arrangement whatever was made about it. The plaintiff gave proof, showing, beyond all question, that she did not suspect that she was there as his tenant, under obligation to pay rent, and the circumstances were such that he must have known how she understood it. If he allowed her to continue in the occupancy of the house, knowing that she did so with the understanding on her part that she was to pay no rent, the law will not raise in his favor an implied promise on her part to pay it. Before the plaintiff can recover for the use and occupation of the house, he must show that the conventional relation of landlord and tenant existed between him and his sister. (*Benjamin* v. *Benjamin*, 5 N. Y. 383 ; *Preston* v. *Hawley*, 101 id. 586.) There must be proof, either that such relation was created by express contract, or there must be proof of circumstances from which the law will raise an implied contract. But the law will not imply a contract contrary to the intention of the parties. There is not an atom of proof in this case that the plaintiff ever expected any rent, or that the intestate ever expected to pay any. The irresistible inference from all the proof is that she occupied and had the use of the house, or so much of it as she desired for her manner of living, free of rent. It is entirely clear, that if she had supposed that she was occupying the entire house, consisting of three stories, as a tenant, and

that she was expected to pay at the rate of $1,000 a year for the rent thereof, she would not have remained there a day. Although the intestate lived four years after she left that house, always abundantly able to pay, it does not appear that the plaintiff ever claimed any rent of her, or even mentioned the matter of rent to her.

Not only did the evidence not warrant a finding that the conventional relation of landlord and tenant existed between the plaintiff and the intestate, or that she ever agreed or expected to pay any rent, or that the plaintiff ever expected to receive any, but there is no finding of any of these facts, except that the intestate had the use and occupation of the house during the time mentioned. Upon such evidence, we think, there was no warrant for a finding that the intestate ever became obligated to pay the plaintiff any rent. He gave her the use of the house; he allowed her to live there, and to rent a portion of it without any expectation of compensation on his part; and, hence there was error of law in ordering a recovery in his favor for the rent and interest thereon.

As to the Sing Sing house, that was a large brick house, three stories and an attic high above the basement. One of plaintiff's witnesses testified that the intestate told her, in the spring of 1879, that " she was going to Sing Sing; that her brother had offered her a home there." The plaintiff testified that " in the spring of 1879 she did not go to Sing Sing directly; she went and hired a room down in Broadway alley, and when she found she had to pay rent, she went to Sing Sing; probably two weeks; she then went to Sing Sing to the house where I lived, and remained there until she died."

When she first went to Sing Sing the plaintiff and his wife were living in the brick house, and for four months she lived in their family. Then the plaintiff and his wife went away, leaving her in the house. They returned again early in December of the same year, and remained there until July, 1880, during which time the intestate lived with them, and they then again went away, and she remained there nearly all the time until her death. The house contained furniture of the plaintiff

and some furniture belonging to the intestate. She lived there alone, occupying a room or rooms in the attic or basement. She lived in a miserly, penurious manner, occasionally renting some rooms in the house. She occupied this house precisely as she did the Lexington avenue house, and the observations made about the occupancy of that house apply to this. All the evidence forbids an inference that there was any expectation of the payment of rent on either side. Under such circumstances reason and justice do not require that a contract to pay rent should be implied, and there can be no presumption contrary to the intention of both parties that the relation of landlord and tenant, either in fact or law, existed. It is true that the possession and beneficial enjoyment of real property with the permission of the owner is ordinarily sufficient to sustain an action upon an implied agreement for use and occupation. (*Osgood* v. *Dewey*, 13 Johns. 240; *Coit* v. *Planer*, 4 Abb. [N. S.] 140; *Baxter* v. *West*, 5 Daly, 460.) But where the use and occupation of real estate is under such circumstances as to show that there was no expectation of rent by either party, a contract to pay rent will not be implied, and this is such a case. There was, therefore, also error in awarding to the plaintiff rent for the Sing Sing house.

During the time above-mentioned, to wit, four months in the summer of 1879, and seven months, from December, 1879, to July, 1880, the intestate lived in plaintiff's family at the brick house in Sing Sing, and the referee allowed plaintiff for her board during those months at the rate of $30 per month, amounting, with interest, to $465.90. She lived with the plaintiff as a member of his family, and not as a boarder. There was no request for board and no arrangement whatever about it. The plaintiff proved that she said she was going there because " her brother had offered her a home there." It is entirely clear that she did not expect to pay for her board and that the plaintiff knew it. There can be no question that both parties understood that she was living there as his sister and as a member of his family; and under

such circumstances the law will not convert her relations to him into that of a boarder, and imply a promise on her part to pay for board. (*Williams* v. *Hutchinson,* 3 N. Y. 317; *Ross* v. *Ross,* 6 Hun, 184; *Carpenter* v. *Weller,* 15 id. 134; *Lyon* v. *Smith,* 35 id. 275.) There was, therefore, error in the allowance made to the plaintiff for the board of the intestate.

It is undoubtedly true that the plaintiff showed great kindness and liberality to his sister. But no one can read this evidence and draw therefrom any inference that he expected any reward from his sister during her lifetime. He knew that she was to the utmost degree penurious and miserly, and that she would hoard her pelf and cling to her property so long as she lived. He doubtless expected that by his kindness to her she would be induced to make a favorable disposition of her property in his favor at her death. The fact that his expectation has been disappointed furnishes no ground for now stamping what at the time were acts of kindness and generosity with the mercenary features of contract and compensation.

We see no reason to doubt that the allowances made by the referee for the other items of plaintiff's claim were properly made; but for the errors above mentioned the judgment of the General Term and that entered upon the report of the referee should be reversed and a new trial granted, costs to abide the event.

All concur.

Judgment reversed.