[No. 27736. Department One. June 5, 1940.]

B. C. KREMMEL, *Respondent,* v. MAGDALENE F. SCHNAUFER, *as Executrix, Appellant.*[1]

[1]Reported in 103 P. (2d) 38.

*Fred M. Bond* and *Wright & Wright,* for appellant.

*John L. Langenbach* and *John T. Welsh,* for respondent.

ROBINSON, J.—Montana Marie Redman died in 1937, leaving an estate consisting of two lots, a house, and household furniture. B. C. Kremmel was appointed administrator, but subsequently a will was found, which nominated Magdalene F. Schnaufer as executrix. Kremmel filed a claim for compensation for services rendered to Mrs. Redman during her lifetime, amounting to $714.50. The claim was rejected by the executrix, and plaintiff brought this action, recovering a judgment for five hundred dollars. The executrix appeals.

Our attention is invited to twenty-four separate assignments of error. But, after a consideration of the record and the briefs, we find it unnecessary to go beyond the general assignment to the effect that the court erred in refusing to enter judgment for the appellant.

A considerable portion of the respondent's brief is devoted to the citation of cases, to the point that findings of the trial court upon conflicting evi-

dence will not lightly be disturbed upon appeal, since the trial court saw and heard the witnesses, etc. That rule would be applied as to the value of the alleged services if we found it necessary to consider that phase of the case; but, as to the primary question, which is whether the plaintiff proved a contract upon which any recovery might be allowed, the rule is not applicable, for it appears from the record that the trial judge did not find the contract upon oral evidence, but wholly from the text of certain correspondence which was introduced as evidence. In announcing his oral decision at the close of the trial, he said: "The contractual relation of employment of Mr. Kremmel is ascertained from these letters."

We, of course, have as good an opportunity of judging as to that as the trial court had; indeed, a much better opportunity, for the letters, of which there are a great number, were read to him during the heat and bustle of the trial, while we have the letters themselves before us, with time and opportunity for inspection and analysis.

For many years prior to her death, Mrs. Redman was a client of the Pacific State Bank of South Bend. Mr. Kremmel was, for a long period, its assistant cashier. In 1921 or 1922, Mrs. Redman purchased a house and lot from the bank. As Mr. Kremmel testified at the trial, which was held in 1938, that he had known Mrs. Redman for eighteen years, he must have been acquainted with her prior to that purchase.

From letters in the record, it appears that he, as assistant cashier, looked after many of her affairs, at least as early as 1926. In November, 1926, for example, when she was in Portland, Oregon, he paid her taxes. In December, 1926, he wrote to her at Portland that special assessments on her property were about to become delinquent, giving her the amount thereof.

In March, 1927, he advised her at Roseburg, Oregon, that he had disbursed certain funds as per her direction. In April, 1927, he wrote her that he had paid certain taxes and made other payments on her behalf. There is a similar letter later in that month, and there are letters of similar nature from time to time until the spring of 1929. Neither he nor the bank made any charge for such services.

In May, 1929, Mrs. Redman went to Alaska as a government employee in the Indian service. She announced her departure in a letter to Mr. Kremmel, which, in part, reads as follows:

"Did not get my check from Ft. Steilacoom hospital. Have quite a one coming but they will send it to me now. I am having all my check sent to you as I don't need much up there and you pay everything and when I come home I will certainly be on my feet.

"If nothing happens to me and if they do you get everything I have as I have no one to leave it to only good friends."

In June, 1929, she wrote Mr. Kremmel, asking him to take care of her taxes, street assessments, and "what I owe the bank," etc., saying also: "I am getting you some lovely cut ivory and ask your wife what kind of fur she likes."

Later in the year, she wrote Mr. Kremmel, asking him to pay an assessment and to have certain repairs made, requested by the tenant of her house. The letter contains such expressions as the following:

"Your letter came after wandering over the waters so long and what a lovely letter it was, was so glad to hear from home, . . .

"I have sent for your ivory up north and your wife's fur will not get until next summer. I am going to have you a beautiful piece of work done by a native here."

During the period from May 24th until September, 1929, Mr. Kremmel was still assistant cashier of the bank. In September, he resigned and went to Eugene, Oregon, where he remained about a year. The rent from Mrs. Redman's house was still paid into the bank for his account, and he still received her government checks. In February, 1930, Mrs. Redman asked him to send her one hundred dollars.

"I have got the fox fur for your wife and it certainly is a beautiful thing, they only get the red fox here but they are fine fur, . . ."

In June, 1930, when Mr. Kremmel was still in Oregon, Mrs. Redman wrote:

"I do hope you can kinda look after things for a little while. I told you have the fur and she is beautiful, but I have to get the man to punch it or it might cost me five hundred dollars fine. . . . I am getting the children here to make some things for your children. I am getting quite a lot of nice things, oh yes, by the way, your ivory is done and it is beautiful, it is a cribbage board, large size. I hope everything is lovely at home and I do hope that I will have a letter from you at my place. With kindest regards, . . ."

There are also in the record a number of Mr. Kremmel's letters to Mrs. Redman. In his letter of July 17, 1929, reporting concerning collections, repairs to her house, etc., he said:

"Anything you want attended to, just write me about it, and I believe the Badgers [her tenants] and I will get along nicely.

"If you strike a bargain in Ivories mentioned in your letter, would certainly appreciate anything from that northern country and so far as the Mrs. is concerned, she likes all kinds of fur."

There are many letters of both parties, but we forbear further quotation. We have examined them

carefully, and in no letter of Mrs. Redman's over the entire period do we find anything which indicates, even remotely, that she expected to pay Mr. Kremmel for his services, and in no letter of Mr. Kremmel's to her is there any indication that he expected to be paid, unless such an inference can be drawn from the following excerpt from the letter in which he announced that he was leaving South Bend to live in Oregon:

"In this connection, if you still prefer, I shall go on attending to your interests and for a year I will be coming to South Bend now and then until I get many interests closed up. At that I can look after your interest better than you could being so far away.

"However, if you prefer to have some one in South Bend or in the bank to take over these duties, it is all right with me, but, on the other hand, if you wish me to continue, shall be glad to serve you."

The record shows that Mrs. Redman and the Kremmels were very close friends. As we have indicated by previous quotation, Mrs. Redman, early in 1926, expressed an intention to leave her property to Kremmel. In 1932, she drew a will in favor of the Kremmels, containing specific bequests to Mrs. Kremmel and each of the children and making Mr. Kremmel residuary legatee. These bequests were preceded by the following introduction:

"B. C. Kremmel and Mrs. Nina D. Kremmel and their daughters have been very considerate of and kind to me and I am much indebted to them."

This will, which, however, does not seem to have been executed, was left with the postmaster of South Bend by Mrs. Redman, with a direction that he deliver it to Mr. Kremmel in case of her death. A year or two afterwards, however, Mrs. Redman reclaimed it.

There is no question but that Mr. Kremmel performed many and varied services for Mrs. Redman

over the nearly eight-year period from 1929 until her death in 1937. During that period, he received and disbursed for her account more than $3,300. In addition to receiving her rentals and government checks and making the disbursements, he secured tenants for her house on two different occasions and attended to their demands for repairs. He also secured an HOLC loan for her, although the record shows plainly enough that a South Bend attorney attended to the details. He testified that he secured a reduction of her personal property taxes,

". . . and two reductions of real estate taxes; the first reduction amounting to about thirty per cent, and the second one ten per cent, reducing taxes from one hundred and forty dollars to eighty dollars."

The county treasurer was called by the defendant. His record showed that the assessed value of the real estate was cut from fourteen hundred dollars to thirteen hundred dollars in 1933, and no other change. This would not possibly produce a reduction of the amount claimed.

There are other things in the record indicating that Mr. Kremmel's services may not have been as extensive as he claims, but we have no doubt that he performed services fully commensurate with the amount the trial court awarded him. In addition to those which we have already detailed, it appears that Mrs. Redman was injured while in the government service, and also that her first husband had been a Spanish war veteran, and Mr. Kremmel had considerable correspondence with governmental authorities in an effort to get her a pension on one or both of these grounds. During the latter years of her life, she was quite ill in Tacoma, apparently with no relative or other person to care for her. There is record proof that Mr. Krem-

mel was summoned there on several occasions, and he testified that he made eight trips to Tacoma on her behalf, and we have no reason to question the truth of this statement.

The claim which Mr. Kremmel presented after Mrs. Redman's death was made up of the following items: Services for ninety-four months at seventy-five dollars yearly, $589.50; eight trips to Tacoma at fifteen dollars each, $120; and various trips to Willapa, $5.00. During the nearly eight-year period, Mr. Kremmel kept accurate account of the money he received belonging to Mrs. Redman and his disbursements for her account, but included nothing for his services. Nor did he ever render her any bill for services during her lifetime, or, although he was an accountant, make any charge therefor, in detail or in gross, in any account or memorandum of his own. After her death, he submitted his claim to an executrix for seventy-five dollars per month for seven years and ten months.

■■ We quote from the article on Executors and Administrators in 24 C. J. at page 406, § 1123 bb. Claims for Services:

"To establish a claim for services, proof of an express contract is not in all cases essential, but claimant must show either an express contract or an implied agreement or mutual understanding that the services were to be paid for, by clear and satisfactory proof; and where there is no express contract the facts showing an implied contract or mutual understanding must be fairly established. . . . Particularly strong and convincing proof is required where the claim is stale, or where the services extended over a considerable period and no demand for compensation was ever made during decedent's lifetime, or where there are any circumstances connected with the claim tending to render it improbable or suspicious."

In this instance, there are no facts, fairly established, showing an implied contract or mutual understanding,

the claim is stale, the services extended over a considerable period, and no demand for compensation was made during the decedent's lifetime.

In *Anderson v. Osborn*, 62 Wash. 400, 114 Pac. 160, the court set aside a judgment entered on a jury verdict in a case where the claimant had recovered against an administrator on a claim for services rendered during the lifetime of the decedent holding that no contract was established. The court clearly indicated in the opinion that a contract will not be implied in such a case from the mere fact that services were performed, but that there must be evidence from which it can be inferred that, while the services were being performed, the plaintiff intended to charge and the defendant intended to pay. We quote briefly from the opinion in that case:

"Respondent strongly urges that, inasmuch as the facts were submitted to a jury, we should not disturb their verdict. Such is our rule as to facts properly submitted to a jury, and if there was any evidence from which the jury could have followed the instructions of the court and found that an intention to charge and an intention to pay for services rendered was present in the minds of respondent and Mrs. Miller when she first went to his home, we would permit. the verdict to remain as a finding upon a contested question of fact."

In this case, there is certainly no evidence to indicate that Mrs. Redman expected to pay for the services. There is a good deal to indicate that she thought they were rendered as an accommodation. Neither is there any real evidence that the respondent ever expected to be paid for the services, since he let eight years go by without rendering a bill of any kind, and, although he was an accountant, never made any memorandum of them for his own use or any charge against Mrs. Redman in his own books. It may be

that this was because he had reason to expect that Mrs. Redman would remember him in her will. But if this is the case, the fact that she failed to do so does not warrant us in implying a contract when there are no facts shown which warrant the implication.

"If services are rendered without the intent of making a charge therefor, or of creating a legal liability thereby, the fact that the person rendering them did so in the hope that the party receiving them would be grateful therefor, and would manifest such gratitude in some substantial form, such as a gift or legacy, does not give to the party rendering such services a right to recover a reasonable compensation therefor if such hopes are disappointed." 2 Page on Contracts (2d ed.), 2474, § 1446.

The reports of other states are replete with opinions from which excerpts may be taken which precisely fit the facts of this case. We quote several of these which, taken together, may well serve as a suitable appendix to this opinion:

"Upon that issue, it should be observed that the fact that services are rendered, even on request, does not create liability where the circumstances repel the inference that compensation was intended." *Carlson v. Krantz*, 172 Minn. 242, 246, 214 N. W. 928, 54 A. L. R. 545.

"The whole case, as we view it, turns upon whether the services of the defendant were voluntary.

"One rule that will be of use to us in determining this question is that, where services are rendered and there is no special promise to pay for the same, and the party claiming for the services kept or intended to keep no account of the work, it is equivalent to saying that he had no intention that any charge should be made therefor, and such service must be regarded as a matter of mutual accommodation for which neither party intended that any charge should be made. *Potter v. Carpenter*, 76 N. Y. 157." *Equitable Life Ins. Co. v. Crosley*, 221 Iowa 1129, 1132, 265 N. W. 137.

"Plaintiffs' actions in making no request for compensation and in keeping no account or record belies any anticipation of reward. A contract implied in fact arises when services are performed by one who at the time expects compensation from another who expects at the time to pay therefor." *In re Pierson's Estate*, 282 Mich. 411, 415, 276 N. W. 498.

"Being an experienced business man, if he intended to make any other claim against the testatrix he naturally would have kept some memorandum of account so as to present his claim to her in an intelligent manner. He did not do so, clearly indicating no thought on his part that he had any such claim." *In re Goldrick's Will*, 198 Wis. 500, 502, 224 N. W. 741.

"He doubtless expected that by his kindness to her she would be induced to make a favorable disposition of her property in his favor at her death. The fact that his expectation has been disappointed furnishes no ground for now stamping what at the time were acts of kindness and generosity with the mercenary features of contract and compensation." *Collyer v. Collyer*, 113 N. Y. 442, 449, 21 N. E. 114.

Presumably, none of the foregoing cases was called to the trial court's attention, for none of them is cited in the briefs filed in this court.

The judgment appealed from is reversed.

BLAKE, C. J., MAIN, MILLARD, and SIMPSON, JJ., concur.