[No. 30165.   Department Two.   June 26, 1947.]

GEORGIE AMMERMAN, *Respondent*, v. THE OLD NATIONAL BANK OF SPOKANE, *as Executor, Appellant.*[1]

*Therrett Towles,* for appellant.

*Brown & Brown* and *Richard W. Axtell,* for respondent.

[1]Reported in 182 P. (2d) 75.

JEFFERS, J.—This action was instituted by Georgie Ammerman, a widow, against The Old National Bank of Spokane, as executor of the estate of Emma B. Keys, deceased, to recover the reasonable value of nursing services rendered by plaintiff to Mrs. Keys during her last illness, from August 16, 1945, to July 15, 1946. It is alleged that the reasonable value of such services was thirty dollars per week, or the total sum of $1,410; that no part of such sum has been paid, save and except the sum of $235, leaving a balance due of $1,175.

It is further alleged that in August, 1946, plaintiff served and filed her claim in the estate of Emma B. Keys, for the sum of $1,175, and that such claim was by the executor rejected on October 8, 1946.

This action was commenced on or about October 18, 1946. Defendant, by its amended answer, admitted the filing of the claim and its rejection; denied that plaintiff rendered any nursing services to Mrs. Keys for which her estate is liable; and alleged that, during the period mentioned in the complaint, and for a period long prior thereto, plaintiff was in the employ of Mrs. Keys as a housekeeper, at an agreed compensation of five dollars per week, plus room and board, for which services plaintiff was paid the sum of $235 mentioned in plaintiff's complaint and other sums, and was furnished with board and room by decedent during the entire period of plaintiff's employment, so that, at the time of decedent's death on July 20, 1946, plaintiff had been paid in full by decedent for such services, and that no sum whatsoever was paid plaintiff by decedent for nursing services.

Plaintiff, by her reply, admitted her employment as a housekeeper for five dollars per week plus room and board, and alleged that, commencing August 16, 1945, plaintiff, at the request of Mrs. Keys, performed additional services in the way of nursing, which were of the reasonable value of thirty dollars per week; that such services were performed each week until July 15, 1946; that no part of such thirty dollars per week has been paid.

The cause came on for trial before the court on December 17, 1946, and thereafter the trial court made and filed a memorandum decision, wherein its views are indicated. On December 26, 1946, the trial court made and entered its findings of fact, conclusions of law, and judgment favorable to plaintiff.

The court found that, at all times herein mentioned, plaintiff was a practical nurse; that, on and between August 16, 1945, and July 15, 1946, plaintiff performed nursing services for Emma B. Keys, which services were of the reasonable value of thirty dollars per week, or the total sum of $1,410; that no part of such sum has been paid, save and except the sum of $235, leaving due and unpaid the sum of $1,175. The court concluded that plaintiff was entitled to judgment against defendant in the sum of $1,175 for additional services rendered Mrs. Keys on and between the dates mentioned, together with interest thereon at the rate of six per cent per annum from July 15, 1946. Judgment was entered in accordance with the conclusions of law, from which judgment defendant has appealed.

The errors assigned are in denying appellant's motion for nonsuit made at the close of respondent's case; in denying appellant's motion for nonsuit made at the close of all the testimony; in refusing to make appellant's proposed finding of fact and conclusion of law; in making finding of fact No. 4; in entering its conclusion of law favorable to respondent; and in entering judgment in favor of respondent.

Appellant states in its brief:

"The sole issue involved in this case is whether or not respondent, a practical nurse, in the employ of decedent for many years as a housekeeper and companion at an agreed compensation, with a close and intimate relationship existing between herself and decedent, is entitled to recover against her estate upon an implied agreement additional compensation for nursing services rendered decedent, where the latter became ill and died during the employment, in the absence of an express agreement on the part of decedent to pay her for such extra services and

in the absence of any demand therefor upon decedent during her lifetime."

There is no material conflict in the evidence in this case, but counsel for the respective parties do differ as to the proper legal conclusions to be arrived at from the evidence.

Respondent had been what is commonly known as a practical nurse for many years. She became acquainted with Mrs. Keys in 1937, at which date, she entered the employ of Mrs. Keys as a companion and housekeeper, at an agreed compensation of five dollars a week, plus room and board. At that time, Mrs. Keys was living in her home at 524 Nineteenth avenue, Spokane. About five years prior to her death, Mrs. Keys moved into the Roosevelt apartments, where the same relationship continued between the parties. The record does not specifically show just what services respondent performed up to August 16, 1945, at which time Mrs. Keys became ill, but there is nothing in the record to indicate that, up to that time, respondent was called upon to do or perform any nursing service for Mrs. Keys. In August, 1945, Mrs. Keys' health began to fail, and it developed that she had cancer of the bladder. She continued to live in the apartment for three weeks and was then removed to Sacred Heart hospital, where she died of the above-mentioned disease on July 20, 1946.

The record shows that, from the time Mrs. Keys became ill until her death, respondent rendered to Mrs. Keys all the services usually performed by a practical nurse. Respondent's testimony shows that, in addition to keeping up the apartment, she rendered nursing service to Mrs. Keys from six to eight hours each day, seven days a week, for the entire period mentioned in her complaint. The testimony of three nurses who were on duty at Sacred Heart hospital during the time Mrs. Keys was there, and who became acquainted with both Mrs. Keys and respondent, shows that respondent attended Mrs. Keys every day from about 10:30 a. m. until they went off duty at 4:30 p. m.; that, on different occasions, Mrs. Keys would ask them to call respondent and request her to come to the hospital. It further

appears that Mrs. Keys was confined to her bed all the time she was in the hospital and was unable to help herself.

Respondent testified in regard to what she did for Mrs. Keys as follows:

"A. I fed her twice a day. I rubbed her back. She had a tube connected with a bottle by the side of the bed; I emptied that bottle, took care of the tube, which would become clogged, and I would clean the drainage tubes. Q. What were the drainage tubes? A. She had cancer of the bladder and there was a catheter inserted inside of the bladder, connected to the bottle at the side of the bed, and that would become clogged and I took the connection out to take care of that. She also had spells of hemorrhaging and kept me busy with towels. Q. You mean hemorrhages of the lungs? A. No. Of the bowels. And the pads had to be cleaned quite often. Of course I took the bedpan, as a practical nurse."

All three of the nurses above referred to stated that respondent was efficient and performed all the services required by Mrs. Keys, except that respondent did not give hypos or medicine. It was the opinion of at least one of these nurses that, but for the services rendered by respondent, Mrs. Keys would have had to have a special day nurse. She had a special night nurse. It also appears from the testimony of these nurses that, due to the war, the hospital was so short of help that it would have been impossible for the nurse on general duty to have given Mrs. Keys the service she required, and as stated, but for the services rendered by respondent, Mrs. Keys would have required a special day nurse. All three of the nurses stated they were familiar with the wages paid to graduate and practical nurses, and that, in their opinion, the services performed by respondent were reasonably worth from six to eight dollars per day.

All of the above testimony was introduced by respondent. At the close of respondent's case, appellant moved for a nonsuit, which motion was denied.

During the cross-examination of respondent, counsel for appellant had her identify what purports to be a statement signed by respondent and delivered to a Mr. Sweeney on

July 22, 1946, which was two days after Mrs. Keys' death. This statement purports to show how respondent expended a part of sixty-two dollars of Mrs. Keys' money between July 8, 1946, and July 22, 1946. It shows certain expenditures for groceries, and certain five-dollar deductions made by respondent, leaving a balance of twenty-five dollars, which she turned over to Mr. Sweeney. It further appears that, at the time respondent accounted to Mr. Sweeney for the sixty-two dollars, she stated to him that she thought she should have some extra money, but did not know how much to ask for, and that Mr. Sweeney told her she would have six months to make up her mind.

The only testimony introduced by appellant was that of Beardsley Merrill, who was associated with the firm of Richards & Blum. This witness, who was in the investment banking business, had known Mrs. Keys for about ten years and had taken care of her financial affairs relative to investments. He stated that Mrs. Keys was a woman of considerable means and had an income of between eight and nine hundred dollars a month from her investments. He estimated Mrs. Keys to be worth from $200,000 to $250,000.

There is no question but that the services performed by respondent for Mrs. Keys during the period mentioned in the complaint were in addition to and different from those which respondent was required to perform under the original contract of employment, and there is no question but that the record shows that the services performed were those usually performed by a practical nurse. There is no question but that, if respondent is entitled to prevail here, she is entitled to recover the amount given her by the judgment entered.

It is not claimed by respondent that there was any express agreement to pay for the additional and different services performed by respondent, but it is contended that the facts are sufficient to show an implied contract to pay for such services.

██ Contracts implied in fact are inferred from the facts and circumstances of the case and are not formally or ex-

plicitly stated in words. 12 Am. Jur. 499, § 4. In the section last referred to, it is stated:

"It is often said that the only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, whether oral or written, sealed or unsealed, while in the latter, their agreement is arrived at by a consideration of their acts and conduct, and that in both of these cases there is, in fact, a contract existing between the parties, the only difference being in the character of evidence necessary to establish it. . . . An implied contract between two parties is only raised when the facts are such that an intent may fairly be inferred on their part to make such a contract. All the pertinent circumstances must be taken into consideration."

"Generally, there is an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient, in the absence of a showing to the contrary. A promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service." 12 Am. Jur. 501, § 5.

As is to be expected, in those cases where an implied contract is relied upon to establish a claim for services performed, each case presents a different situation in some respect, and as a result each case is dependent upon the facts proven.

This court has had presented to it two different situations in which the party claiming compensation for services performed for a person in his or her lifetime relied upon an implied contract to establish his or her right to recover, the claim for such services not being presented or any demand made for such compensation until after the death of the party for whom it was claimed the services were performed. The first situation is presented by such cases as *Anderson v. Osborn*, 62 Wash. 400, 114 Pac. 160; *Kremmel v. Schnaufer*, 4 Wn. (2d) 242, 103 P. (2d) 38; *Bank of California v. Ager*, 7 Wn. (2d) 179, 109 P. (2d) 548; and *Fineson v. McMahon*, 12 Wn. (2d) 41, 120 P. (2d) 482; cited by appellant, wherein the claim for services was based upon what we shall term

an original contract to pay for the services claimed to have been performed.

In the *Anderson* case, *supra,* the jury were instructed that

".  .  .  before they could find for respondent [the person who claimed to have furnished the support and maintenance to Anna Miller], they must find that, from the time Anna O. Miller came to live at his home, she intended to pay for her support and maintenance, and that the intention to charge and the intention to pay for such support and maintenance must have been in the minds of both parties."

The opinion then states:

"Such is unquestionably the law. When such a relation as we here find is assumed, there can be no recovery by either party unless there be a contract to charge for the services rendered by the one party, or a contract to pay for the support furnished by the other party. Otherwise it will be presumed that the relation was one of mutual benefit, and both the service and the support a gratuity. .  .  . Not only must a contract be established, but the relation of the parties must have had its initiation in such a contract, when it is sought, as here, to support the cause of action upon the *original relation.*" (Italics ours.)

This court did not say just what facts the respondent would have had to show in order to recover, but the court does proceed to state certain facts from which it concluded that there was nothing in the record which even hinted at or pointed to any contract on the part of Mrs. Miller to pay for her support, or any intention on the part of the respondent to charge for such support.

The *Kremmel* case, *supra,* refers to and quotes from the case of *Anderson v. Osborn, supra.* In the *Kremmel* case, we stated:

"In this case, there is certainly no evidence to indicate that Mrs. Redman expected to pay for the services. There is a good deal to indicate that she thought they were rendered as an accommodation. Neither is there any real evidence that the respondent ever expected to be paid for the services, since he let eight years go by without rendering a bill of any kind, and, although he was an accountant, never made any memorandum of them for his own use or any charge against Mrs. Redman in his own books."

It may be further stated that, during much of the time Mr. Kremmel furnished the service to Mrs. Redman, he was assistant cashier of the Pacific State Bank of South Bend, of which Mrs. Redman was a client. The *Kremmel* case quotes the following statement from 24 C. J. 406, § 1123bb:

" 'To establish a claim for services, proof of an express contract is not in all cases essential, but claimant must show either an express contract or an implied agreement or mutual understanding that the services were to be paid for, by clear and satisfactory proof; and where there is no express contract the facts showing an implied contract or mutual understanding must be fairly established. . . . Particularly strong and convincing proof is required where the claim is stale, or where the services extended over a considerable period and no demand for compensation was ever made during decedent's lifetime, or where there are any circumstances connected with the claim tending to render it improbable or suspicious.' "

In the *Bank of California* case, the claim was presented by a sister of the deceased. We referred to the case of *Kremmel v. Schnaufer, supra,* and again quoted from 24 C. J. 406.

In the *Fineson* case, *supra,* we referred to both the *Anderson* and *Kremmel* cases and quoted from the former. We held that the appellant (plaintiff below) had wholly failed to establish a contract to charge for the services rendered to Mr. McMahon during his lifetime.

The second situation is one such as we have before us in the instant case, where there was an original contract of employment for an agreed amount, and where, during the life of the original contract, the party who was required to perform certain services under the original contract performed additional and different services, which additional and different services were accepted by and were of benefit to the party receiving them. We have such a situation in the case of *In re Masterson's Estate,* 108 Wash. 307, 183 Pac. 93.

The claim involved in the cited case was presented by Emma J. McManis, a sister of John Masterson, deceased,

and was for nursing Masterson. The facts considered by the court, as shown by the opinion, were as follows:

"At the time he [John Masterson] began to room and board with his sister [Emma McManis], the deceased was a bachelor, approximately forty years of age. For his board and room the sister was to receive $20 per month. This was paid at the end of each month by the guardian [A. K. Rice was guardian of Mr. Masterson] and was receipted for by the daughter of Mrs. McManis. After a few months, the amount paid was increased to $30 per month, and subsequently to $40. The evidence shows that all the money received was expended for the use and benefit of the deceased. The claim presented, and which was allowed by the court, was by Mrs. McManis for nursing her brother during the fourteen months mentioned [being the fourteen months prior to his death], it being her contention that she was to be paid for the nursing in addition to his room and board. During all of this time he was in a deplorable condition, both physically and mentally."

The opinion then discusses another question raised in the case, after which the court had the following to say in regard to Mrs. McManis's claim:

"The other branch of this case, that of the claim, presents largely a question of fact. It will be admitted that the rule is that, when one seeks to establish a claim against an estate for *extra services rendered the deceased during his lifetime,* where regular payment for services was received under the original contract, the burden of showing an agreement for such extra services, either express or implied, is on the one asserting the claim; and that, where payments have been made on the original contract at regular and stated periods, it is the presumption that such payments were received as *full compensation* for the services rendered. The evidence in support of the claim for extra compensation must be of the *clearest and most convincing character.* . . .

"In this case the evidence meets the requirements of the rule stated. It shows that no part of the sums paid prior to the death of John Masterson were for the nursing upon which the claim in controversy is based. The money received was for room and board and for other articles for the use and benefit of the deceased. In addition to the other testimony, A. K. Rice, who had been the guardian of the person and estate of John Masterson, and who appears to be a disinterested and credible witness, expressly testi-

fied that no payment had been made Mrs. McManis for nursing, *and that there was to be a charge for that service later.* The record presents no reason for disturbing the holding of the trial court upon the allowance of the claim. . . . As above indicated, *since the evidence clearly and convincingly establishes a just claim for nursing, based upon an understanding with the guardian, its allowance by the trial court is approved.*" (Italics ours.)

The case last cited is the only one cited from this state which presents facts which may be said to be similar to the facts in the instant case; but, in the cited case, it will be noticed that in the concluding paragraph of the opinion, emphasis is placed upon an understanding with the guardian of John Masterson, that the extra services for nursing would be paid for later. In other words, as we read the opinion in the cited case, there was an understanding between the guardian of John Masterson and Mrs. McManis, at the time she began to render this additional service, that she would be paid for such service.

The rule announced in the *Masterson* case is undoubtedly the law in this state, and applicable to the instant case.

Counsel for respondent, in addition to the *Masterson* case, also cites the case of *Carlen v. Cashman's Estate,* 190 Wash. 248, 67 P. (2d) 896, but we find nothing in the latter case which changes or modifies the rule announced in the *Masterson* case.

A reading of the cases hereinbefore cited will show that, under the rules announced by this court, the degree of proof required to establish a claim for services under an original contract, be it express or implied, is no different from that necessary to establish a claim for additional and different services. However, in the latter case, where the one performing the service accepts the payments agreed to under the original contract, there is a presumption that he accepts them in full payment for all services. In both cases mentioned, the proof must be of the clearest and most convincing character.

Respondent also cites and quotes from *Sowash v. Emerson,* 32 Cal. App. 13, 161 Pac. 1018; and it is true that,

in the cited case, the court, after referring to the rule invoked by the defendant, stated:

"The rule sought to be invoked and applied here by the defendant, however, does not, in a case where an employee under a contract to perform certain stipulated services for a fixed compensation sues to recover for special services rendered to his master of a dissimilar nature to those for the performance of which he was originally employed, require such employee to show that such extra services were rendered in pursuance of an express contract, whereby the master agreed or promised to pay extra compensation therefor, to entitle the servant to recover such extra compensation. *If he can show that dissimilar special services were by him performed and that the master accepted the same and the benefits thereof, then the law will imply a promise to pay therefor, and thus there is shown a contract upon which he is entitled to recover.*" (Italics ours.)

We can agree with the last-cited case in so far as it states that no express agreement is necessary; but we are unable to agree that it is the law in this state that the mere furnishing of the extra and dissimilar service by the employee, and the acceptance of such service by the master or employer, is sufficient to establish an implied contract upon which a recovery may be had, for we stated in *Kremmel v. Schnaufer,* 4 Wn. (2d) 242, 103 P. (2d) 38, in referring to the case of *Anderson v. Osborn,* 62 Wash. 400, 114 Pac. 160:

"The court clearly indicated in the opinion that a contract will not be implied in such a case from the mere fact that services were performed, but that there must be evidence from which it can be inferred that, *while the services were being performed, the plaintiff intended to charge and the defendant intended to pay.*" (Italics ours.)

In the *Masterson* case, the services upon which the claim was based were different from those required to be performed under the original contract, and yet we stated that, when payments are made under the original contract and received, the presumption is that such payments are received in full compensation for the services rendered. We also stated that the evidence in support of the claim for extra compensation must be of the clearest and most convincing character.

We are impressed with the fact that, in the instant case, respondent did furnish to Mrs. Keys services of a different character than those she was required to furnish under the original contract, but we are unable to find in the record anything upon which to base an implied contract, other than that such services were furnished and received. Respondent and Mrs. Keys had become close friends at the time Mrs. Keys was taken sick. Respondent accepted the five dollars per week and her board and room, as provided in the original contract, up to the time of Mrs. Keys' death. During that period, she made no claim of any kind for additional compensation, nor did she suggest that she thought she was entitled to any.

There is nothing in the record to indicate that Mrs. Keys expected to pay for such additional services. Respondent, having money belonging to Mrs. Keys in her possession, did not deduct anything for such additional services, but did deduct the five dollars per week to which she was entitled under the original contract. As stated, respondent never stated to anyone, in so far as the record shows, that she was entitled to or expected to be paid for such additional services, until July 22, 1946, which was two days after Mrs. Keys' death, at which time, in accounting to Mr. Sweeney for the sixty-two dollars belonging to Mrs. Keys, she stated that she thought she should have some extra money but did not know how much.

We are satisfied that respondent was entirely honest and sincere in making her claim, but we are unable to find in the record sufficient facts upon which to base an implied contract to pay for the nursing services performed by respondent.

For the reasons herein assigned, the judgment of the trial court is reversed, and the cause is remanded with instructions to enter a judgment dismissing the action.

MALLERY, C. J., STEINERT, ROBINSON, and HILL, JJ., concur.