[No. 33248.  *En Banc.*  September 22, 1955.]

Eva G. Pape, *Respondent*, v. Grant Armstrong *et al.*,
*Appellants.*[1]

[1] Reported in 287 P. (2d) 1018.

*The Attorney General* and *Fred L. Harlocker, Assistant,* for appellants.

*McMicken, Rupp & Schweppe* and *Mary Ellen Krug,* for respondent.

DONWORTH, J.—Plaintiff, a nonacademic employee of the University of Washington, brought this action against its board of regents to determine the ownership of the sum of $1,769.02. The controversy arises out of plaintiff's election to withdraw from the university's retirement plan and transfer to the Washington state employees' retirement system.

The case was tried to the court sitting without a jury and resulted in a judgment for plaintiff in the amount prayed

for, together with interest thereon from September 14, 1953.

From this judgment, the board of regents has appealed and has assigned as error the making of two findings of fact and two conclusions of law upon which the judgment was based and also the allowance of interest.

The facts are not in serious dispute. Some twenty exhibits were admitted in evidence, which consist principally of documents and correspondence relating to the activities of the university authorities with reference to the transfer of nonacademic employees from the university plan to the state system.

An understanding of the historical background of these two plans and respondent's participation therein (with appellants' authorization and approval) requires a rather detailed statement of the facts of the case.

Respondent has been continuously in the university's employ as a nonacademic employee since April 9, 1928. On July 21, 1939, the board of regents, acting pursuant to chapter 223, Laws of 1939, p. 935, established a compulsory retirement plan (effective September first) for all employees who had completed two years of service. This plan required the employer and the employee to each contribute an amount equal to five per cent of the employee's monthly compensation as premium for an annuity contract issued by the Teachers' Insurance and Annuity Association of America (herein called the TIAA). The university reserved the right to discontinue or reduce its contribution at any time. In describing this plan, the minutes of the board state:

"*Contracts.* Each retirement annuity contract written in accordance with this plan will be the property of the individual participant; the contract is between the participant and the insurance company."

The University of Washington Record (then the official publication of the university), in the November, 1948, number, informed the faculty and staff regarding these annuities as follows:

"What do the faculty and other staff members have to show for it? Each person is given an individual personal

contract with the TIAA. It is as personal a contract as a life insurance policy. This contract and the money which it represents, both from his own salary and the state's additional contribution, are his property, subject to the terms of the contract."

The TIAA is a large nonprofit corporation, operating under a grant from the Carnegie Corporation, engaged in the business of issuing life insurance and annuity contracts to members of the faculty and other employees of some six hundred schools and colleges. This corporation was approved by the board of regents as the underwriter of annuities for the university's employees.

In 1947, pursuant to chapter 223 of the Laws of 1947, p. 944, the board prescribed certain rules and regulations relative to the university plan. These stated, among other things, that "the annuitant shall have full title to his policy." Thereafter, the monthly contributions made by respondent and by the university were increased to amounts equal to seven and one-half per cent of her salary. Contributions were made on this basis from September 1, 1947, to and including July 1, 1953.

The state system was created by chapter 274, Laws of 1947, p. 1168, for the benefit of all state employees and became effective October 1, 1947. This system was not available to employees who were participants in other retirement plans. RCW 41.40.120 (4).

In the early part of 1952, a number of nonacademic employees became dissatisfied with the university plan and desired to transfer to the state system. Groups of these employees had meetings with the comptroller of the university and his assistant to obtain information and consider how such a change could be brought about.

On September 27, 1952, the comptroller brought this matter to the attention of the board of regents, which took action thereon as follows:

"*Withdrawal of Non-Academic Employees from University Retirement Plan*

"The Board authorized the withdrawal of such nonacademic employees as may desire to do so from the Uni-

versity's retirement plan with the TIAA for the purpose of taking and maintaining membership in the state employees' retirement system, provided satisfactory enabling procedures can be arranged."

The annuity contract issued to respondent by the TIAA had no provision for a cash surrender nor for a loan on the policy. Therefore, it could not be canceled without the consent of the issuer. The comptroller wrote to the TIAA concerning this problem, and the latter agreed to repurchase contracts from those employees who wished to transfer to the state system.

The comptroller requested an opinion from the counsel for the university, Mr. John Spiller, who advised that the university had title to the funds contributed by it toward annuity premiums, but the university could use these funds (to the extent necessary) for the purpose of contributing to the employee's membership in the state system. On receipt of Mr. Spiller's written opinion, the comptroller wrote a form letter to all interested parties containing a comparative table showing the relative benefits of each plan. Concerning the legal opinion, this letter stated:

"I. *For Those Who are Currently on the TIAA Program and Wish to Transfer to the State Program*

"Mr. John Spiller, legal counsel for the University, has ruled that employees currently on the TIAA retirement plan and wishing to transfer to the State plan can receive from the total accumulation in their TIAA policy *only their own contributions* plus interest on those contributions. Each employee transferring to the State system will be required to pay 5% of his first $3,600 of yearly salary (unless fully contributing when 5% of entire salary is paid) for each year of service back to October 1, 1947, or 6 months from date of original employment, whichever is most recent. The University will, of course, pay from its contributions to the TIAA the sum required to establish you in the State retirement system. Any sum remaining of the employee's TIAA contributions after this payment, will be paid in cash to the employee. Employees whose accumulations in TIAA are not sufficient to pay the amount required for membership in the State plan will be given credit in the State plan for as much of their service as their accumulation will cover."

(Appellants argue that the foregoing constituted notice to the employees that acceptance of *only their own contributions* was a condition precedent to their transferring to the state system. For reasons hereinafter stated, we do not agree with this contention.)

The assistant comptroller wrote to Mr. Spiller in reference to his legal opinion and concluded his letter with this paragraph:

"It is going to be difficult to explain to employees making the transfer to the State plan that any accumulation of matching funds remaining in their annuity contracts after the necessary payments have been made to the State plan, will revert to the State. The employee has been repeatedly told that the matching funds paid by the University are his sole property. Information mailed to the employee at the time he goes on the program so states (see enclosed material) as does the Faculty Handbook (see page 37). If there is any provision in any law that would permit the University to use its remaining portion in a TIAA annuity contract as a matching sum for an employee's additional contribution to the State retirement plan for retirement purposes, it would be of immeasurable value in working out the transfer to the State plan for those employees who wish to transfer. An early reply to these questions would be appreciated."

Mr. Spiller's reply to this letter referred to his original opinion as covering the comptroller's suggestion above quoted.

Respondent executed a form showing her election to transfer to the state system, another form requesting the TIAA to repurchase her annuity contract and pay the proceeds to the university. She surrendered her policy, and it was repurchased for $5,052.38, which was remitted to the university.

On September 14, 1953, respondent received and cashed a check issued to her by the university in the amount of $1,-550.57. Accompanying this check was a voucher stating that it was in full payment of the following items:

```
"Total Refunded by TIAA.......................   5,052.38
Less University's Contribution......................   2,526.19
Total Employee's Share............................:.........   2,526.19
Less Amount Paid to State Retirement Board
    Expense Fund ..........................   12.00
    Savings Fund ..........................  963.62     975.62
                                                       --------
Total Refund .....................................   1,550.57"
```

Appellants state the principal issues involved as follows:

"1. Would it be an unlawful diversion of state funds to permit respondent to receive the excess of appellants' TIAA contributions?

"2. Was there an agreement implied in fact that appellants were to retain the excess of their TIAA contributions?

"3. In the absence of an agreement implied in fact, is an agreement implied by law that appellants were to retain the excess of their TIAA contributions?

"4. In the event respondent should prevail herein, are appellants chargeable with interest on the amount of the recovery for any period prior to the date of judgment?"

In our opinion, the first question stated above must be answered in the negative. Appellants or their predecessors in office were authorized by the legislature to use public funds to assist their employees to purchase old age annuities under such rules and regulations as they might prescribe. They did so by adopting the plan of paying one half of the monthly premiums. Appellants, acting through their authorized agents, represented to the employees, at least three separate times, that these annuity policies belonged wholly to the employees.

It was, of course, not at that time contemplated that these policies would be surrendered for cash. They could not be cashed in unless the owners and the TIAA mutually agreed thereto, but when these parties did so agree, the net proceeds of the sale of policies to the TIAA vested in the owners of the policies. The surrender of the policy for cash did not change the ownership thereof nor affect the title to the policy or the proceeds thereof. No interest or title in the proceeds was thereby created in the university merely because it had originally paid half the premiums.

The title to their policies having been vested solely in the respective employees at the time of cashing in of the policies, the title to the proceeds resulting from the purchase by the TIAA was likewise in them. No gift of public moneys was involved in the transaction. Appellants used a portion of respondent's money to establish her as a member of the state system with the same rights as if she had originally become such member on October 1, 1947, when chapter 274, Laws of 1947, became operative.

Appellants at no time imposed, or sought to impose, any condition precedent to respondent's exercising her right to transfer to the state system. Appellants never required the employees to accept Mr. Spiller's opinion as to their title to the disputed funds. The excess funds were deposited in one of the university's accounts. The president of the university advised one of the interested groups of nonacademic employees by letter on July 17, 1953, that the disputed funds were being so held "until the issue is finally resolved."

██ It is contended by appellants that respondent is, in effect, estopped to assert her claim of title to this money because:

"By accepting and endorsing her check without protest, respondent confirmed that she had at all times understood that she was to receive only the balance of her own contributions and was not to receive the excess of appellants' contributions. Never at any time was there any suggestion to the contrary. This was shown by her own testimony."

But we do not find any evidence in the record tending to show an intention on the part of either the university or respondent that, by delivering and accepting this check, either party was to be precluded from asserting a claim to the excess shown on the accompanying statement. The university did not alter its position in reliance upon respondent's action. As pointed out above, the president (presumably with appellants' approval) had had the disputed funds impounded until the issue should be finally resolved. He stated in his letter, referred to above, that "there need be no fear concerning the disposition of the funds." This

reassurance was sufficient to justify respondent in believing that acceptance of the amount paid her did not constitute a waiver of her claim to the disputed funds. Nothing happened until after this suit was commenced to apprise respondent that appellants were contending otherwise.

Appellants' next two contentions are that, under the facts of this case, there was either an agreement implied in fact or an agreement implied in law, that appellants were entitled to excess of the university's contributions to the premiums on respondent's annuity policy. As the trial judge observed in his memorandum opinion, "the two contentions are to a degree antithetical."

The trial court correctly pointed out there were no conditions surrounding this transaction from which it might be fairly inferred that the parties intended to be bound in the manner contended by appellants. The applicable rule was considered by this court in *Ammerman v. Old Nat. Bank,* 28 Wn. (2d) 239, 182 P. (2d) 75, where we quoted with approval from 12 Am. Jur. 499, § 4, as follows:

" 'It is often said that the only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, whether oral or written, sealed or unsealed, while in the latter, their agreement is arrived at by a consideration of their acts and conduct, and that in both of these cases there is, in fact, a contract existing between the parties, the only difference being in the character of evidence necessary to establish it. . . . An implied contract between two parties is only raised when the facts are such that an intent may fairly be inferred on their part to make such a contract. All the pertinent circumstances must be taken into consideration.' "

The difference between an express and implied promise is in the mode of proof. There must be a mutual manifestation of assent in either case, and the burden of proof is on the party asserting the promise.

Here we have only the fact that respondent elected to transfer to the state system, requested the TIAA to repurchase her annuity policy, and accepted a check from the university in an amount less than the net proceeds derived

from the surrender of her policy. There is no evidence that she did any of these things for a valuable consideration passing to her from the university. She had a legal right to do these things even if the university had been opposed to her actions in the premises (which it was not).

There being no express promise to pay to the university the excess of its contribution to the annuity premiums, we can not find any evidence from which we could reasonably infer a mutual assent of the parties thereto. Consequently, we are of the opinion that appellants' second contention is without merit.

■ Nor is the principle of quasi contract or contract implied in law applicable to this case, for the reason that respondent does not have the disputed funds in her possession. Appellants are holding the money. Consequently, the principle invoked cannot be applied to respondent. *Bill v. Gattavara,* 34 Wn. (2d) 645, 209 P. (2d) 457.

Appellants' fourth contention is that, even if respondent recovers, she is not entitled to interest prior to the date of judgment because this is an action against the state.

■■ We are constrained to agree with this contention. In *State ex rel. Pate v. Johns,* 170 Wash. 125, 15 P. (2d) 693, we held that the board of regents was an agent and instrumentality of the state and is suable only in Thurston county. The state cannot be sued without its consent, and then only in the manner and to the extent provided by statute. *Spier v. Department of Labor & Industries,* 176 Wash. 374, 29 P. (2d) 679; *Columbia Steel Co. v. State,* 34 Wn. (2d) 700, 209 P. (2d) 482. Since no applicable statute consenting to the state's being held liable for interest has been called to our attention, we hold that the trial court erred in including the provision for interest in the judgment.

The judgment of the trial court is hereby modified by striking therefrom the words "together with interest thereon at 6% per annum from September 14, 1953 until paid." As so modified, the judgment is affirmed. Neither party shall be allowed costs in this court.

ALL CONCUR.