[No. 30416. Department Two. March 1, 1948.]

JOHN MULLALLY et al., *Respondents and Cross-appellants,*
v. J. F. PARKS et al., *Appellants.*[1]

[1]Reported in 190 P. (2d) 107.

*Ralph B. Potts,* for appellants.

*Meier & Murray,* for respondents and cross-appellants.

Steinert, J.—Plaintiffs brought suit to quiet title to a strip of ground lying adjacent to the boundary line common to their land and that of the defendants, and to recover treble damages from defendants for willful trespass in cutting down a number of trees situated on the strip of ground in question. Defendants denied the claims of the plaintiffs and, by cross-complaint, sought to have title to the land in dispute quieted in them. After trial without a jury, the court entered a decree quieting title in the plaintiffs and awarding them damages as against one of the two sets of defendants in an amount considerably less than that prayed for in the complaint, but refused to treble the amount so awarded. Defendants appealed from the entire decree, and plaintiffs cross-appealed from that portion thereof which related to the amount of damages allowed.

At the time of the commencement of .this action, respondents, John Mullally and Mary Mullally, husband and wife, were the owners of lot 3, block 1, Seattle Suburban Home Tracts, lying in government lot 4, section 15, township 26 north, range 4 east, W. M. Appellants J. F. Parks and Lora Parks, husband and wife, were the owners of the westerly one hundred fifty feet of lot 4, and appellants Fred J. Schroeder and Rose Schroeder, husband and wife, were the owners of the remainder of lot 4, which lies immediately south of lot 3, in the same block.

The dispute herein is with respect to the boundary line common to lots 3 and 4. Respondents contend that this line extends in a southeasterly direction from the westerly boundary of both lots; appellants contend that it extends in a northeasterly direction. The parcel of land in dispute comprises a wedge-shaped strip approximately two hundred seventy-five or three hundred feet in length and varying from twenty to twenty-five feet in width.

Seattle Suburban Home Tracts was platted in 1891. Blocks 1, 2, 3, and 4 thereof constitute the south half of government lot 4, section 15, township 26 north, range 4

east, W. M. The correct bearing of the boundary line common to lots 3 and 4 depended, originally, upon the bearing of the south line of government lot 4. However, in preparing the official plat of Seattle Suburban Home Tracts, the surveyor failed to designate the bearing of the south line of the government lot, but indicated it on the plat simply as a "base line" running from the "initial point" to Lake Washington. It further appears from the record herein that the meander corner at the easterly terminus of this base line has been lost and the witness trees have been cut down.

On April 17, 1920, one Floyd Schmoe, a predecessor in interest of respondents, entered into a real-estate contract with Charles O. Dignan to purchase from the latter lot 3, which was then unimproved land, but partially wooded. Mr. Schmoe was at that time a student in the College of Forestry of the University of Washington.

Within a few weeks after his purchase, Schmoe, with the aid of a fellow student, surveyed lot 3, determining thereby the south boundary line of the lot. At that time, surveying was a basic course in forestry, and, although neither Schmoe nor his friend was a professional surveyor, they did have at least an elementary knowledge of surveying.

Schmoe, a witness for respondents, testified that the survey was made in the following manner: They first located the southwest corner of section 15, wherein lot 3 lies. Then, taking the bearings that were recorded on the official plat of Seattle Suburban Home Tracts, and with the use of a transit and a steel tape, they ran the lines, turned the corners, and measured off the lots in that particular vicinity. By this process they determined the boundaries of lot 3. In their operation, they found old white cedar plot stakes which evidently had been put in at the time the division of the area was made. Schmoe testified that these stakes were either pointed out to him by his vendor prior to the purchase or else were discovered by him shortly after the purchase. After checking these old stakes, Schmoe and his assistant set out new stakes between the old ones in order to establish the exact lines on lot 3. Thereafter, they blazed

trees along the south boundary line of the lot as previously marked by these stakes, thus establishing what we shall hereinafter refer to as the Schmoe survey line.

At this time, lot 4, which lies immediately south of lot 3, was owned by John Metke, through whom appellants derive their title. According to Schmoe's testimony, Metke was present a part of the time while the survey was being made, and, although he did not physically assist in the actual making of it, he did check the survey with Schmoe.

After the survey was completed, Schmoe cleared a roadway into lot 3, built a small house on the premises, and in February, 1921, moved onto the property, where he and his family lived until 1936 or 1937. During the years of his occupancy, he did additional clearing, graded for a lawn, built trails around the borders of the property and down to Lake Washington on the east, and put in considerable plantings. Along the south boundary line of lot 3 as determined by his survey, and in what is now the area in dispute, Schmoe, in clearing the land, left certain trees standing. He also planted in that same vicinity additional ornamental trees, consisting of eastern white pine, several of the deodar type, some balsam and white pine, and a California redwood. Some of these trees were planted within a few feet of the Schmoe survey line.

From that line and towards the north, lot 3 slopes sharply downward. The easterly one third of the lot drops off to the east down a steep cliff. Commencing at the top of this cliff, Schmoe built a white cedar split rail fence approximately one hundred feet long and extending westwardly along his survey line. Westward of this fence and along the same line were planted trees, including a Norway spruce and a balsam.

On February 14, 1925, Schmoe acquired full title to lot 3 by warranty deed. Sometime thereafter, water was piped onto the property from a water main which ran along the western boundary. This water pipe joined the water main near the southwest corner of the lot, or within fifteen or twenty feet of it. About this same time, a power line was put through, and one of the power poles was placed at a

point one foot in from the stake at the southwest corner, on lot 3. Schmoe was paid "a dollar for that one foot."

Between 1925 and 1928, Mr. Metke, owner of lot 4, had that lot cleared. Until that time, it had been largely wooded with second growth Douglas fir, alder, and maple trees. Thereafter Metke built a small cabin on the property, in which he and his family lived during the summers. He also cultivated a portion of the lot by planting grass thereon.

Schmoe testified that Metke cleared "up and to the line we established, directly to the line." Mrs. Magna Metke, sister-in-law of the Mr. Metke to whom reference has heretofore been made, testified that Metke cleared lot 4 "up to what Schmoe considered his line." Schmoe further testified that, during the many years that he owned lot 3, no claim was ever made by Metke to any property north of the clearing on lot 4, that is, north of the Schmoe survey line.

In 1937, Schmoe sold lot 3 to Richard D. King, who was engaged in the real-estate business. King occupied the property until 1939. At the time of selling the property, Schmoe pointed out to King the water main, the corner stakes, and particularly the south boundary line, including the rail fence, the stakes, and the power pole. It was King's understanding that lot 4, the Metke property, included the clearing up to and ending at the rail fence which Schmoe had built and the barbed wire fence which was then also in existence, along the Schmoe survey line, and that lot 3, the Schmoe property, extended north from this line of fence. King utilized lot 3 as far as the fence line, clearing some of the brush, planting ferns and flowers, and using the area now in dispute as a play space for his children. He also placed an oil drum just north of the fence.

During the years that King owned and occupied lot 3, Metke never claimed any part of it or any part of the property lying north of the Schmoe survey line. Both Schmoe and King paid the taxes on lot 3 during the years they owned that property.

In April, 1939, King sold lot 3 to Miss Mary Gray, now Mrs. Hartnagel. At the time of the sale, King pointed out to Mrs. Hartnagel the boundaries of the lot. She testified at

the trial that, at the time she purchased the lot, the rail fence was standing, that a barbed wire fence ran westwardly along the northerly edge of the clearing made by Metke, that there were several ornamental trees on the property in the area now in dispute, and that along the north side of the fences was a trail, which she subsequently kept up. While owner of lot 3, Mrs. Hartnagel either occupied the property herself or else rented it to others. She testified that during all of the period of her ownership neither Mr. Metke nor anyone else owning the property south of the Schmoe survey line made any claim to any part of the land lying north of the rail fence, the barbed wire fence, or the edge of the clearing previously referred to by her. Mrs. Hartnagel occupied and claimed lot 3 up to the Schmoe survey line. In 1942, during the time she owned the property, the house on lot 3 burned down, and since then the property has not been occupied. Mrs. Hartnagel paid taxes on the lot during the entire period of her ownership.

On August 30, 1945, respondents purchased lot 3 from Mrs. Hartnagel, receiving from her a statutory warranty deed. In negotiating the sale, Mrs. Hartnagel showed Mr. Mullally the property, pointing out to him the landmarks, the rail fence, the ornamental trees in the area now in dispute, and the clearing on lot 4. Mr. Mullally understood that the boundary line between lots 3 and 4 was the Schmoe survey line.

In July, 1947, Mr. Lee Abbott, a civil engineer and licensed land surveyor, surveyed lot 3 for respondents and erected stakes along the south boundary of that property. A few days before the trial, Mr. Schmoe, Mr. King, and Mrs. Hartnagel visited the property, and thereafter they all testified that the line established by Mr. Abbott, and up to which respondents now claim title, was approximately coincident with the Schmoe survey line, being the line to which they had understood lot 3 extended and up to which they claimed and occupied when they owned that property.

On April 10, 1946, Metke conveyed lot 4 with other property by statutory warranty deed to J. F. Parks, one of the appellants herein. Shortly thereafter, appellants Schroeder

purchased lot 4, less the westerly one hundred fifty feet thereof, from Parks and wife.

In July, 1946, Parks procured Mr. Francis A. Bergstrom, a licensed land surveyor, to survey lot 4. Bergstrom testified that he staked the true north boundary line of lot 4, which he found to be between twenty and twenty-five feet north of the Schmoe survey line as re-established by the Abbott survey.

Mr. Schroeder, who watched Bergstrom make the survey, testified that, according to that survey, the south boundary line of lot 4 split in half an old house which was supposed to be entirely on that lot, and that, because of the result of the survey, he tore down the house. This would indicate that Metke, who built that house, thought that both the north and the south line of lot 4 were further south than the Bergstrom survey showed. About the time that Schroeder tore down the house, he informed Mr. Mullally of the result of the Bergstrom survey. Mullally visited the property, observed the Bergstrom stakes, and had some conversation with Schroeder regarding the situation. He indicated to Schroeder that he wanted the lines left as they originally were.

Thereafter, without the knowledge or consent of respondents, Schroeder went upon the land north of the Schmoe survey line and cut down four fir trees, varying in size from eight to twenty inches in diameter, and one sixteen-inch maple tree, all of which were growing in the area here in dispute. A short time later, Mr. Mullally strung a wire, with "no trespassing" signs fastened to it, along the Schmoe survey line, and subsequently commenced this action.

Mr. Schroeder testified at the trial that, at the time he cut down the trees, he knew that the north boundary line of lot 4 was in dispute, but that he had understood from Mrs. Hartnagel that the line was somewhere inside the wooded area and not at the edge of the clearing on lot 4. The Schroeders have never occupied lot 4, nor have the Parks ever used or occupied any property north of the clearing on that lot. The latter did, however, build a corral

of barbed wire on the western portion of lot 4, extending up to the Schmoe survey line.

Shortly before the trial of this action, appellants and their witnesses visited the area now in dispute. They testified, contrary to the testimony of respondents' witnesses, that they could find no evidence of a rail fence, although some of them did observe some rusty strands of barbed wire in that general area.

By its decree, the trial court quieted title to the disputed area in the respondents. As clearly shown by the court's oral decision at the conclusion of the trial, the court arrived at its conclusion upon the theory that an agreed boundary line had been established and acquiesced in by the owners of lots 3 and 4, predecessors in interest of the parties to this action, over a period of more than twenty years. The court did not base its decision, in whole or in part, on the ground of adverse possession, as appellants seem to contend.

In a long line of decisions, this court has consistently held that where boundaries have been defined in good faith by the interested parties, and thereafter for a long period of time acquiesced in, acted upon, and improvements made with reference thereto, such boundaries will be considered the true dividing lines and will govern, and whether the lines as so established are correct or not becomes immaterial. *Turner v. Creech,* 58 Wash. 439, 108 Pac. 1084; *Windsor v. Sarsfield,* 66 Wash. 576, 119 Pac. 1112; *Roe v. Walsh,* 76 Wash. 148, 135 Pac. 1031; 136 Pac. 1146; *Rose v. Fletcher,* 83 Wash. 623, 145 Pac. 989; *Egleski v. Strozyk,* 121 Wash. 398, 209 Pac. 708; *Farrow v. Plancich,* 134 Wash. 690, 236 Pac. 288; *Eubanks v. Buckley,* 16 Wn. (2d) 24, 132 P. (2d) 959; *Light v. McHugh,* 28 Wn. (2d) 326, 183 P. (2d) 965. Accord: *Strom v. Arcorace,* 27 Wn. (2d) 478, 178 P. (2d) 959; *Light v. McHugh,* 28 Wn. (2d) 336, 183 P. (2d) 470.

In *Turner v. Creech, supra,* which involved a boundary dispute, we said:

"Practical or agreed location of a boundary line may result from long acquiescence in its location, or when drawn and acted upon by the parties, as where valuable improve-

ments are placed with reference to it and before it is denied by either party."

In *Rose v. Fletcher, supra,* which also involved a boundary dispute, we sustained our position taken in the *Turner* case, *supra,* and quoted with approval from *Jackson v. Van Corlaer,* 11 Johns. (N. Y.) 123, as follows:

"After they [the parties] have deliberately settled a boundary line between them, it would give too much encouragement to the spirit of litigation, to look beyond such settlement, and break up the lines so established."

In *Farrow v. Plancich, supra,* where we held the dividing line between certain properties to be a line established by the parties' predecessors in interest, rather than one determined by a recent survey, we stated:

"For many years the owners of these two lots accepted the original line as properly located and the fence built thereon as marking the line between the two properties. Whether the line as originally established is correct is now immaterial, because the lapse of time and the action of the parties will now fix it as the true line."

In the instant case, the true and correct property lines in that locality have been uncertain, if not unknown, for a long period of time. Appellant Fred Schroeder himself testified on cross-examination:

"After this controversy come up I went all around the neighbors, the old timers; even talked to Mr. Metke several times, and only thing I could find out that has been holding fire for years out there, and nobody knew where their property lines were."

Many of the original monuments are no longer in existence, as appellants' surveyor Bergstrom testified. The difficulty of establishing the true line between the lots here in question is evidenced by the fact that two licensed surveyors, one employed by the appellants and the other by the respondents, found the "true" boundary line to be in different places, separated by a distance of some twenty or twenty-five feet.

The trial court made no formal findings of fact, nor was it required to do so. However, the evidence in the

case would justify findings to the effect that a boundary line between the two lots had been established by agreement and acquiesced in for a period of over twenty years by the respective property owners concerned therein, and that during that period improvements had been made with regard to that line.

Upon the facts as the trial court apparently thus found them from the evidence, and under the law as hereinbefore stated, we approve the action of the court in quieting title to the disputed strip of land in the respondents.

Respondents, in turn, cross-appealed from the judgment and now contend that the trial court erred in that it fixed the damages to their property in an inadequate amount and refused to treble the amount so fixed.

In their complaint, respondents prayed for damages in the sum of five hundred dollars. Mr. Mullally testified that the damage to his property by reason of the cutting down of the trees amounted to one thousand dollars. The court allowed damages in the sum of only fifty dollars.

A realtor who had sold property in the Seattle Suburban Home Tracts, and who was familiar with the property here in question, testified that cutting down the trees "wouldn't make one bit of difference" so far as the value of the real estate was concerned; that, in fact, cutting them down improved the view; and that the only value of the trees would be for firewood.

The court saw and heard the witnesses, weighed their testimony, and drew its conclusions as to the amount of actual, present damages sustained by the respondents. We are unable to say, from the record, that the court erred in fixing the amount of damages actually sustained, and hence we will not modify its decision in that respect.

Respondents further contend that the trial court should have trebled the amount of damages, under the authority of Rem. Rev. Stat., § 939 [P.P.C. § 103-5], which provides:

"Whenever any person shall cut down, girdle, or otherwise injure or carry off any tree, timber, or shrub on the land of another person . . . *without lawful authority,*

in an action by such person, . . . against the person committing such trespasses, . . . if judgment be given for the plaintiff, it shall be given for treble the amount of damages claimed or assessed therefor, as the case may be." (Italics ours.)

The trial court was apparently of the opinion that the foregoing statute was inapplicable, and that the acts of appellant F. J. Schroeder in cutting down the trees were excusable under the provisions of Rem. Rev. Stat., § 940 [P.P.C. § 103-7], which declares:

"If upon trial of such action it shall appear that the trespass was *casual or involuntary,* or that the defendant had *probable cause* to believe that the land on which such trespass was committed was his own, . . . judgment shall only be given for *single damages.*" (Italics ours.)

Rem. Rev. Stat., § 939, quoted above, was interpreted by this court in *Harold v. Toomey,* 92 Wash. 297, 158 Pac. 986, where we said:

"While it is true that this court construes the statute (§ 939, *supra*) strictly and will discountenance any trebling of damages except in cases where the trespass is voluntary and an element of wilfulness or malice is combined therewith, nevertheless, the statute was enacted for a just, double purpose—to punish a voluntary offender and to provide, by trebling the actual present damage, a rough measure of compensation for future damages not generally ascertainable.

"Although the statute is penal in its nature, this action is not a criminal or penal action, but is merely a civil action for tortious damages, with added penal damages. It is not, therefore, necessary to prove an intent on the part of the tort feasor, any more than the commission of the act and its consequences. Even in criminal cases, the rule is that 'intent need not be proven by direct testimony; it may be inferred from the act itself and from the circumstances surrounding and attendant upon its commission.' "

In *Fredericksen v. Snohomish County,* 190 Wash. 323, 67 P. (2d) 886, 111 A. L. R. 75, this court observed, with reference to Rem. Rev. Stat., § 940, *supra,* that, in order to exonerate the trespasser from treble damages, it must be made to appear (a) that the trespass was casual or invol-

untary; or (b) that the trespasser had probable cause to believe that the land upon which the trespass was committed was his own, or that of the person in whose service or by whose direction the act was done; or (c) that the tree or timber was taken from an uninclosed woodland for the purpose of repairing a public highway or bridge upon the land or adjoining it.

The court then said:

"While it is necessary, under the cases referred to, that there be some element of wilfulness, it is not necessary to prove intent on the part of the trespasser,"

citing with approval, and quoting from, *Harold v. Toomey,* *supra.* The court then held that an element of willfulness was sufficiently shown in that case by proof that county employees slashed trees and shrubbery on lands adjoining a highway, knowing at the time, or being then charged with knowledge of, the width of the highway at the point of the slashing.

In *Heybrook v. Index Lbr. Co.,* 49 Wash. 378, 95 Pac. 324, where a boundary line was in dispute, the defendants ran a survey of the line, using an improper method for determining the true line, which the court termed "an arbitrary standard not sanctioned by usage or law." Relying upon this survey, defendants entered upon plaintiff's property and cut timber up to the line so established, despite the protests of the plaintiff. This court held the defendants liable for treble damages.

In *Lawson v. Helmich,* 20 Wn. (2d) 167, 146 P. (2d) 537, 151 A. L. R. 930, defendant was held liable for treble damage for willful trespass, where, knowing that there was a dispute with reference to the location of a boundary line, he nevertheless went ahead and cut down certain trees beyond the line on lands subsequently determined by survey to belong to the plaintiff.

While the cases cited above differ somewhat in point of fact from the case at bar, as they likewise differ from each other, they nevertheless well illustrate the principle that where the trespass is without lawful authority, the tort feasor will be subject to treble the amount of damages

assessed, unless it be shown that the trespass was casual or involuntary, or that the trespasser had probable cause to believe that the land on which the trespass was committed was his own.

The trial court found, under the evidence, that the disputed area was a part of lot 3, which belonged not to the appellants, but to the respondents. There is no contention, nor does the evidence show, that appellants or any of them had lawful authority from respondents to enter upon the land and cut down the trees. It is clear from the evidence that the trespass committed by appellant F. J. Schroeder was not casual nor involuntary, but deliberate, definite, and intentional, his expressed purpose being to provide his own property with a better view. As to probable cause for belief by Schroeder that the disputed land belonged to him, it can be said in his favor that he had the assurance of the Bergstrom survey, which either he or Parks had procured. However, having procured the survey, Schroeder informed respondents of the result, and was thereupon given to understand that the respondents wanted the disputed line left as it previously had been established. In other words, appellants were definitely apprised of the fact that, despite their survey, the line was in dispute. With that knowledge, Schroeder deliberately, and without respondents' consent, entered upon the land and cut down the trees, acts which he was not authorized to do, destroying property which could not be replaced. This, in our opinion, supplied the "element of willfulness," spoken of in the cases as being necessary where treble damages are asked and allowed.

Where a person has knowledge of a bona fide boundary dispute, and thereafter consciously, deliberately, and intentionally enters upon the disputed area for the purpose of destroying, and does destroy, trees or other property which cannot be replaced, such acts are neither casual nor involuntary, nor can they be justified upon the basis of probable cause for belief by the tort feasor that he owned the land, but, on the contrary, are without lawful authority and will subject such person to treble damages as provided by statute.

The decree is affirmed upon appellants' appeal, and modified upon respondents' cross-appeal, with direction to the trial court, upon the question of damages, to enter judgment for respondents as against appellants Schroeder in the sum of one hundred fifty dollars, being treble the amount of the actual damages assessed.

MALLERY, C. J., BEALS, HILL, and JEFFERS, JJ., concur.

