[No. 49-40468-2. Division Two. April 21, 1970.]

LEONARD JOHNSTON, *Respondent*, v. V. C. MONAHAN *et al.*, *Appellants.*

Blair, Thomas, O'Hern & Daheim, James E. O'Hern, Bogle, Gates, Dobrin, Wakefield & Long, and M. Bayard Crutcher, for appellants.

Chamberlin & Johnson, G. B. Chamberlin, Conniff, Taylor, Moffett & Behrhorst, and Tyler C. Moffett, for respondent.

PETRIE, J.—This is an action to quiet title to certain tidelands in Sequim Bay; more particularly, to determine whether or not plaintiff Johnston (who once owned all of the land involved in this dispute) and his grantee, Lloyd Mack, subsequent to the sale to Mack, effectively agreed to a lateral boundary to the second class tidelands fronting on their adjoining uplands so as to bind Mack's grantees, defendant's Monahan and Erdahl, and their present lessee, defendant, Pope and Talbot, Inc.

The essential uncontested facts are that prior to 1954, Johnston owned an extended strip of shoreland, together with the adjoining second class tidelands, along the southwest shore of Sequim Bay, a portion of which included an operating log dump and races used to store rafts of logs until towed away. In 1954 he sold a portion thereof, which we shall refer to as the eastern strip, (which included the log dump and facilities) to Lloyd M. Mack and Jessie Mack, his wife, and retained ownership in the remaining portion, which we shall refer to as the western strip. Both Johnston and Mack decided upon the on-the-ground location of the upland boundary between the eastern and western strips, and through the services of a surveyor, obtained a legal description of the upland area to be sold. On September 14, 1954, they executed a real estate contract for the sale of the eastern strip to Mack. On the same date Johnston also executed a statutory warranty deed conveying the property to Mr. and Mrs. Mack. The deed was left with the bank at Port Townsend apparently for ultimate delivery to Mack upon payment of the full purchase price. Both the contract

and deed described the property conveyed as, the total strip owned by Johnston,

TOGETHER WITH all tide and shore land of the second class, situate in front of, adjacent to or abutting upon that portion of the government meander line lying in front of Lot 3, 4 and 5 in Section 12, Township 29 North, Range 3 West of the Willamette Meridian; and Tract 2 in Lot 4 in Section 12, Township 29 North, Range 3 West of the Willamette Meridian.

EXCEPTING FROM the above described uplands and with tidelands adjoining an irregular and elongated tract of land . . . [describing the western strip].

It should be noted at this point that the upland north-south boundary between the two strips was specifically described, but the tideland boundary was not established in either document.

Mack commenced operation of the log dump utilizing the facilities then at the site. In 1956 he assigned one-half of his purchaser's interest in the contract to, and entered into partnership with, V. C. Monahan. The purchase price was apparently paid in full to Johnston in September, 1959 and shortly thereafter the deed was delivered. Within a year thereafter, Mack died and on September 6, 1960, Mrs. Mack conveyed all of the eastern strip to Monahan.

The record is not clear as to exactly how or when M. S. Erdahl acquired an ownership interest in the eastern strip. However, on October 11, 1961, Monahan and Erdahl leased the eastern strip to Pope & Talbot, Inc., for a period of 10 years. On May 27, 1964 Monahan and wife executed a quit-claim deed for a one-half interest in the eastern strip to Erdahl and wife.

In April, 1965, Johnston instituted this action claiming that subsequent to the 1954 sale he and Mack had agreed that the tideland boundary between the two strips would commence at the point where their common upland boundary intersected with the meander line and from that point would extend across the tidelands running North 45° East. His prayer for relief sought to forever bar the named de-

fendants from asserting any right, title or interest to the tidelands west of the N 45° E line.

Defendants Monahan and Erdahl, denying any agreement as to the tideland boundary inconsistent with their use of the premises, rely upon the instruments conveying title to them and their predecessors, and seek dismissal of the complaint. Defendant Pope & Talbot, Inc., in addition to asking dismissal of the complaint, allege and seek alternatively an easement upon so much of plaintiff's premises as the court might find interferes with their use of the log dump and booming ground.

After trial to the court, and after several post trial proceedings, the court entered judgment which declared the east boundary of Johnston's tidelands to be a line running N 45° E from the common upland boundary; determined Monahan's and Erdahl's west tideland boundary along the same line; and granted Monahan and Erdahl the right to use the dock and races in conformity with the use of said facilities as it existed on September 14, 1954, as shown by exhibit 33, an aerial photograph taken on May 17, 1956.

It seems appropriate, initially, to clarify the nature of the boundary dispute and to isolate the primary question of law involved in this appeal. Our Supreme Court has specified five separate and distinct methods of resolving boundary disputes short of execution of formal documents duly recorded. In *Lamm v. McTighe*, 72 Wn.2d 587, 434 P.2d 565 (1967), the court enumerated those methods at page 591 as follows:

> (1) Adverse possession . . . ; (2) parol agreement of the adjoining landowners . . . ; (3) estoppel in pais . . . ; (4) location by a common grantor . . . ; and/or (5) mutual recognition and acquiescence in a definite line by the interested parties for a long period of time . . .

(Citations omitted.)

In *Lamm*, the court clearly distinguished cases of "parol agreement" from cases of "mutual recognition and acquiescence", and established specific criteria for the latter

type method of resolving disputes. The Supreme Court has not had occasion recently to synthesize prior opinions involving truly "parol agreement" and to establish definitive criteria to test the sufficiency of such agreements. The case at bar provides us an opportunity to attempt such a definition.

■ One declaration of the rule is simply:

An oral agreement between owners of adjoining tracts of land fixing a dividing boundary the location of which was honestly disputed, ceases to be within Class IV of § 178 [statute of frauds applied to sale of interest in land], and becomes enforceable when the agreed boundary has been marked or has been recognized in the subsequent use of the tracts, or when other action has been taken by either party in reliance on the agreement.

Restatement of Contracts § 196(1) (1932).

A more precise textual treatment of the rule is:

An agreement between adjoining owners as to the location of a boundary line, though merely oral, is not, it is generally conceded, invalid as being within the Statute of Frauds, provided the agreement is followed by actual or constructive possession by each of the owners up to the line so agreed upon, and provided, further, that the proper location of the line is uncertain or in dispute.

. . .

An agreement as to a common boundary line, which is effectual, as between the parties thereto, also concludes their successors in title, subject to the proviso, it would seem, that a purchaser for value cannot be affected by his predecessor's agreement unless he took with actual or constructive notice thereof.

(Footnotes omitted.) 2 Tiffany, Real Property § 653 at 678 and 682 (3d ed. 1939).

Unfortunately, there are relatively few decided cases in the state of Washington upon which we may rely for definitive criteria to be followed to ascertain whether or not property owners have entered into effectively binding express agreements to resolve boundary disputes. Lest there be any misunderstanding, we distinguish the many cases which have laid down exact criteria in cases of common

grantor, estoppel in pais, and mutual recognition and acquiescence. However, the Supreme Court has recognized several useful articles discussing the problem. *See Lamm v. McTighe, supra,* n. 1.

Armed with such authorities as are at hand, we are prepared to specify the minimum requirements for valid agreements and minimum requirements for proper execution thereof: (1) There must be either a bona fide dispute between two coterminous property owners as to where their common boundary lies upon the ground or else both parties must be uncertain as to the true location of such boundary; (2) the owners must arrive at an express meeting of the minds to permanently resolve the dispute or uncertainty by recognizing a definite and specific line as the true and unconditional location of the boundary; (3) they must in some fashion physically designate that permanent boundary determination on the ground; and (4) they must take possession of their property by such occupancy or improvements as would reasonably give constructive notice of the location of such boundary to their successors in interest; or (as an alternative to (4) above), (4a) bona fide purchasers for value must take with reference to such boundary. *Waldorf v. Cole,* 61 Wn.2d 251, 377 P.2d 862 (1963); *Angell v. Hadley,* 33 Wn.2d 837, 207 P.2d 191 (1949); *Mullally v. Parks,* 29 Wn.2d 899, 190 P.2d 107 (1948); *Thompson v. Bain,* 28 Wn.2d 590, 183 P.2d 785 (1947); *Jackman v. Germain,* 96 Wash. 415, 165 P. 78 (1917); *Rose v. Fletcher,* 83 Wash. 623, 145 P. 989 (1915); *Windsor v. Sarsfield,* 66 Wash. 576, 119 P. 1112 (1912); *Hruby v. Lonseth,* 63 Wash. 589, 116 P. 26 (1911); *Loustalot v. McKeel,* 157 Cal. 634, 108 P. 707 (1910); *Brummell v. Harris,* 148 Mo. 430, 50 S.W. 93 (1899).

These requisite elements, therefore, provide (1) a prerequisite condition of boundary uncertainty or dispute to circumvent the statute of frauds; (2) permanency and specificity of the agreement resolving the dispute or uncertainty; (3) initial execution of the agreement by demarcation on the ground; and (4) full execution of the agreement by

use of the premises pursuant to the agreement to provide reasonable notice thereof.

Mutual recognition and acquiescence for the full period of time to secure property by adverse possession—while often present in the establishment of boundaries by parol agreement—is not an indispensable element in the doctrine. However, inherent in the doctrine is some aspect of acquiescence by reason of the requirement that sufficient possession of the property must be taken to provide constructive notice to successors.

Based upon these criteria, can we say that Leonard Johnston and Lloyd Mack effectively established a common tideland boundary between their two adjacent parcels of property? We note, preliminarily, that there is no question about the uncertainty of the parties as to the true location of the boundary. No boundary whatsoever could have been extant until the land was divided into two strips; and it was not until some time after the initial conveyance that the parties discussed the problem of tideland boundary. Thus, clearly the first criterion has been met. How well the other criteria have been fulfilled must be determined from review of several of the findings of fact entered by the trial court, to which, incidentally, the defendants have assigned error. Those findings of fact are as follows:

6.

That the use of the tidelands, [by Mack] as shown by Exhibit No. 33, does not include the use of any of the tidelands reserved by the Plaintiff in the agreement with Lloyd Mack in 1954.

7

Plaintiff and Lloyd M. Mack agreed upon and established a common boundary between their respective tidelands, commencing at a point where the common boundary of their respective uplands intersects with the meander line of Government Lot 5, thence running across the tidelands from that point North 45° East; thence Northeasterly along said line across the end of the races, as shown in Exhibit No. 33, to extreme low tide, and that said intersecting point on the uplands and the meander

line was marked with a concrete marker, which marker is still in place as set by them.

## 9.

The Court finds, and will establish, the boundary line between the uplands owned by the Plaintiff and the uplands owned by Lloyd M. Mack's successors in title, as disclosed by marks on the ground and the instruments of conveyance and finds, and will establish the boundary line between the tidelands owned by the Plaintiff and the tidelands owned by Lloyd M. Mack's successors in title, on a line running North 45° East from the intersection of the common boundary of the uplands with the shore line, or Government meander line in Government Lot 5; thence to extreme low tide, subject to the use of the aforesaid dock and races and of the tidelands for dumping, moving, rafting and storing logs, poles and rafts and moving the same to deep waters in conformance to the use as it existed on September 14, 1954, as shown by Exhibit No. 33.

These findings connote four types of action on the part of Johnston and Mack: They (1) "agreed", (2) "established", (3) "marked", and (4) "used". Although the matter is vigorously disputed, there is ample evidence in the record to support that portion of the court's finding that Johnston and Mack "agreed upon . . . a common boundary." We accept that portion of the finding and thus determine that the second criterion has also been met.

■ Next, we consider how satisfactorily Johnston and Mack marked their agreement on the ground and how effectively they assumed possession of their respective strips of land so as to give constructive notice of the tideland boundary. The "marking" as designated in finding of fact 7, is clearly insufficient, because that finding merely indicates how the parties marked the initial point of a line —the intersection of the meander line with their upland boundary. To mark one point only on a line is to not mark it at all. However, the finding declares that the parties "established a common boundary". We will consider this conclusional portion of the finding in view of the remainder of the findings and the several memorandum opinions; *Ben-*

*nett Veneer Factors, Inc. v. Brewer,* 73 Wn.2d 849, 441 P.2d 128 (1968); and ascertain whether or not the court's meaning of the finding is supported by substantial evidence in the record.

In a memorandum opinion entered April 20, 1967, the trial court commented upon the activities of Johnston and Mack, attempting to mark or establish their agreement, as follows:

> They obtained a large piece of concrete and together moved this concrete on to the tidelands and deposited it there as a marker, but it is not located on the line that is now claimed and has never been on the line. No other improvements have been made with reference to the line, and there is strong evidence to indicate that in the vicinity of the races and the movement of log rafts that the said Mack and his successors in interest have never acquiesced in the line.

Plaintiff's exhibit 1, a survey of tidelands fronting this property and prepared in 1965 by a surveyor for Mr. Johnston, clearly marks the location of this concrete monument as being slightly off the N 45° E line.

Plaintiff Johnston's own testimony somewhat vividly describes the circumstances surrounding the placing of the concrete marker:

> A Well, me and Mr. Mack put a large concrete monument out approximately 190 to 200 feet from this point on the meander line, and we put that there for our *temporary* boundary line, supposed to be north 45 east.
> Q And what was the purpose of having that there at that time?
> A The purpose of having that line at that time was simply because we needed a line so I could continue digging clams and he could operate the log dump and have our boundary line division established in that way until we could have an engineer correct us *if we was wrong.*
> . . .
>
> Q Is the marker still in the same location as when you dropped it?
> A It is.

(Italics ours.)

It is apparent from the record that while Mr. Mack was alive no final engineering study was ever completed. We skip, for the moment, consideration of whether marking two points approximately 200 feet apart constitutes sufficient marking and assumption of possession so as to give constructive notice of a tideland boundary line. The one point that is eminently apparent, even in Mr. Johnston's mind, is the fact that the second point marked was temporary only. This, in itself, signifies to us that the parties did not permanently designate the permanent boundary on the ground. Although, this factor alone would negate compliance with the minimum criteria to establish a boundary by parol agreement, we deem it appropriate to discuss other facets of this appeal which compel the same conclusion.

This portion of our opinion concerns the use of the premises by the several parties involved, the extent to which they occupied the tidelands and made improvements thereon. As indicated by finding of fact 6 (set forth in full above), the trial court determined that Mack's use of the tidelands, as shown by aerial photograph taken in 1956 (exhibit 33) did not violate the N 45° E line. The court further found that the races, as shown by another aerial photograph taken a few days before trial in 1967 (exhibit 32), had been extended some 300 feet beyond the use made of the races by Mack in 1954. We set forth the court's finding of fact 5 in full:

That Exhibit No. 33, introduced herein by the Defendants and incorporated herein by reference as though reproduced herein, is an aerial photo with the land lying to the south and the water to the north, taken on May 17, 1956 on a scale of one inch equals four hundred feet (1″=400′) and shows the log dump and the use of the log dump as it was at the time of sale by Plaintiff to Lloyd M. Mack in 1954. That Exhibit No. 32, as introduced by the Defendants, is an aerial photo *on a scale of one inch equals 400 feet* (1″=400′) and it shows the log dump and the use of the log dump as it existed a few days before trial of this action. *That Exhibit No. 32 shows an extension of the races of 300 feet along the*

*same course line as Exhibit No. 33, over and above that shown by said Exhibit No. 33.*

(Italics ours—defendants have assigned error to italicized portions only.)

 It is apparent that the last sentence of the foregoing finding was deduced solely from a comparison of the two aerial photographs. In such case, we are free to conduct our own examination of the exhibits. *In re Estate of Larson,* 71 Wn.2d 349, 428 P.2d 558 (1967). Again, we look to the memorandum opinion entered April 20, 1967, to ascertain how the court arrived at this finding. From that memorandum we note that the trial court quite appropriately found a landmark common to both exhibits and thereupon marked off distances to the end of the races as shown in each exhibit. The court remarked:

Using the same basis, the races extended 1,000 feet from this base point while being used and operated by the plaintiff, and extend 1,300 feet at the present time. Accordingly, the races have been extended 300 feet.

The trial court assumed, we believe mistakenly, that both exhibits were reproduced on the same scale (1″=400′). The record does not support that assumption. The evidence in the record establishes merely that the two photos were approximately the same scale—or that their respective scales were relatively close. We need not concern ourselves, however, with the exact scale of each of the aerial photographs. Our concern relates merely to the *relative* scale which exists between the two photographs. Eyeballing the two exhibits reveals that the photographs are indeed approximately the same scale, but closer scrutiny indicates that they are clearly not precisely the same scale. Bearing in mind the notorious inaccuracies inherent in aerial photographs, which become magnified when taken from differing angles, we have nevertheless, concluded, as the record indicates, that each exhibit accurately reflects the painstaking care with which each photograph was taken, and that they do not demonstrate any gross distortion in the critical areas of concern. Thus viewed, and by taking several different

measurements from several selected points common to each exhibit, we can safely conclude that the relative scale of exhibit 32 to exhibit 33 is 1.3/1.0. Thus the trial court's measurements from a common point to the end of the races of 1,300 units on exhibit 32 and 1,000 units on exhibit 33 really indicate that the races had *not* been extended between 1956 and 1967. We might indicate, incidentally, that this conclusion is overwhelmingly supported by the record.

The full import of this determination is brought into focus when we examine plaintiff's exhibit 1 (the survey previously referred to as having been made in 1965) indicating that an extension of 247 feet along the line of the dock (from the end of the dock) would intersect with the N 45° E line. It is uncontroverted that the races extend 480 feet beyond the end of the dock. There is no contention that the length of the dock itself has been substantially altered. Thus, it can be seen that Mack's use of the races from the very start of his occupancy, as well as the present use, has been inconsistent with the N 45° E line.

Finally, there is no indication in the record, nor any finding, that Mr. and Mrs. Erdahl took with reference to any tideland boundary; it is certainly questionable whether Mr. and Mrs. Monahan took with reference to an agreed boundary, although they knew that plaintiff was asserting a tideland boundary agreement.

We find, therefore, that for the several reasons outlined in this opinion, (1) lack of permanency of marking, (2) lack of use consistent with the agreement, and (3) lack of notice, the agreement (the making of which we are obliged to accept) was never fully and validly executed. The judgment is reversed with direction to dismiss the plaintiff's complaint.

ARMSTRONG, C. J., and PEARSON, J., concur.

Petition for rehearing denied May 21, 1970.