[No. 1956–3. Division Three. June 29, 1977.]

*In the Matter of the Estate of*
EMMA MAY BERGEVIN.

CLAIRE SPOHN, ET AL, *Appellants,* v. CLARO E. BERGEVIN, *Respondent.*

*Stanley D. Taylor* and *Peterson, Taylor, Day & Shea,* for appellants.

*Richard F. Monahan* and *Votendahl & Monahan,* for respondent.

WILLIS, J.*—A person seeking the most horrible example of how not to probate an estate might think that he had found it here. The able and experienced trial judge put it more tenderly when he said, "The administration of this estate leaves much to be desired, and this is recognized by all concerned."

The difficulties arose because after the death of the wife and the institution of probate proceedings upon her estate, the surviving husband continued his management and use of the farm properties, owned partly by himself and partly by the estate, as though he were the sole owner, entitled to do whatever he wished with the properties and owing an accounting of their use to no one. This continued for a period of 18 years until his death, as will be seen in the subsequent recitation of the facts.

In 1922, Clement, or Clem, Bergevin received a deed to a parcel of farm property in Walla Walla County, that is referred to herein as "the home place." This was in the nature of an inheritance from his parents, and it became his separate property. No contention is made by the appellants that such parcel is any part of their mother's estate.

In February 1923, Clem and Emma May Bergevin married. In 1935 they purchased another piece of farm property, referred to in these proceedings as "the Williams place." They then began and continued the farming of both units as one operation.

Four children were born to Clem and Emma May Bergevin: one son, Claro E. Bergevin, the respondent herein; his twin sister, Claire Spohn; Mary Armstrong; and

---

*Judge Robert J. Willis is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

Margery Smith. The daughters, Claire and Mary, are the appellants in this cause.

Emma May Bergevin died intestate on January 1, 1956. Shortly thereafter, the surviving husband and the four children petitioned the court for the appointment of Clem and Claro as coadministrators of Emma May's estate. Such appointment was made on April 17, 1956. On June 21, 1957, an inventory and appraisement of the estate's properties was filed. Included in the inventory, and appraised as having no value, was an indebtedness owing from Margery Smith and Ted Smith, her husband, in the amount of $28,419.57. A tax release from the State Inheritance Tax Division was filed on September 30, 1965.

1. Both administrators were responsible for mismanagement of the estate.

As previously stated, after the administration of the Emma May Bergevin estate was started, it was largely ignored or forgotten; and Clem Bergevin, with the help of his son, Claro, continued his cattle and farming operation as though he were the sole owner of all the properties involved. During the next 12 years only two petitions were filed requesting permission of the court to mortgage and sell real property. Such insensitiveness to the existence and interests of the pending estate continued during the balance of Clem's lifetime, which ended on December 3, 1973.

Claro testified that the only action he ever remembered taking in the estate (until after his father's death) was counting the cattle. The trial court, in its written memorandum, stated,

Clement Bergevin was the dominant administrator, and I am satisfied his coadministrator was not consulted, nor did he actually participate in the administration of the estate until after his father's death. This is pretty conclusively shown by the fact that none of the heirs raised any questions about the estate until their father's death.
. . .

The file reflects that the surviving administrator filed an accounting within three months of his father's death, which is again an indication that the father was making decisions prior to this time.

We agree with the trial court that Clem was indeed the dominant administrator; and whatever decisions were made concerning the estate, as few as they were, were made by him.

The appellants point out, however, that the dominance of the father constitutes no excuse to the son for the failures and inadequacies of the probate procedure. They cite RCW 11.48.010:

It shall be the duty of every personal representative to settle the estate in his hands as rapidly and as quickly as possible, without sacrifice to the estate. He shall collect all debts due the deceased and pay all debts as hereinafter provided . . .

They also cite 31 Am. Jur. 2d *Executors and Administrators* § 625, at 268 (1967), relating to the responsibilities of coadministrators:

Acts done by one of them in the regular course of administration of the estate, or in regard to the possession, control, or disposition of the estate, are deemed the acts of all. Thus, one representative may bind his corepresentatives by the collection, discharge, or compounding of a debt, . . .

We are satisfied, therefore, under the law, Claro was equally responsible with his father for the 18 years of nearly complete avoidance of their duties as personal representatives of the estate to bring its administration to a reasonably prompt conclusion.

On the other hand, we can understand the acquiescence of the son in merely accepting every decision of the father who apparently was acting toward the property as though it remained *his* farm. We agree with the finding of the trial court that there is no evidence "that either of the administrators ignored the laws of probate in an effort to defraud the heirs."

2. The allowance of probate expenses.

The appellants urge that the trial court was wrong in allowing expenditures by the administrators, citing RCW 11.76.100:

In rendering his accounts or reports the personal representative shall produce receipts or canceled checks for the expenses and charges which he shall have paid, which receipts shall be filed and remain in court; however, he may be allowed any item of expenditure, not exceeding twenty dollars, for which no receipt is produced, if such item be supported by his own oath, but such allowances without receipts shall not exceed the sum of three hundred dollars in any one estate.

The appellants also cite RCW 11.76.010, which requires the personal representative to make an annual written report to the court of the affairs of the estate, including, among other things, a statement of:

[T]he amount of property, real and personal, which has come into his hands, and give a detailed statement of all sums collected by him, and of all sums paid out, and it shall state such other things and matters as may be proper or necessary to give the court full information regarding any transactions by him done or which should be done.

The record is clear that at no time during the life of Clem Bergevin was there any compliance or attempted compliance with either of the above statutes. The first report to the court was by Claro as the surviving administrator about 3 months after his father's death. In addition, no records were kept concerning either farm income or expenses, and no effort was made to make any segregation of either the gross or net productions as between the home place and the Williams place.

Faced with such difficulties, the surviving administrator prepared and filed, on February 22, 1974, his final account and petition for distribution, which contained no attempted accounting concerning the estate's assets or its income or expenses. This was followed by the appellants' petition to require accounting, filed on August 6, 1974.

After the petition to require accounting was served on the administrator, he attempted with the help of an accountant, to reconstruct, from his own memory and from whatever other evidence was available, a report and account of what had occurred to the assets of the estate since his mother's death and what net income it produced. Such accounting, contained in the amended final account and petition for distribution, prepared in February 1975, is admittedly deficient as not being supported by exact evidence of either income or expenses, but is offered by the respondent as being the best accounting either he or the estate is capable of making.

The appellants contend, in particular, that the accounting is deficient in rejecting what they describe as "viable alternatives," which they set forth under their assignments of error Nos. 3, 4 and 5. We will consider these matters in the order indicated.

    3. The trial court did not err in allowing nothing for the rental value of the house on the estate property for 18 years.

Exhibits 10 and 11, which purport to show the actual income from the Williams place for 1974 and 1975, respectively, indicate that the house on the property was rented during that period for $65 per month or $780 per year. The only testimony concerning any previous rental of the house was from Claro that, "it was handled entirely by my dad, Clem,—and sometimes it was rented and sometimes it wasn't." This is not an adequate basis for this court to say that the estate had received as rental income for the house the $14,250[1] suggested by the appellants, or any part thereof.

---

[1] $780 x 18 = $14,040.

4. The trial court properly considered Annex "J" (Ex. 12) and Annex "K" (Ex. 9) as evidence of the estate's earnings.

The gist of appellants' argument on this phase of the case is that the actual income from the Williams place in 1974 and 1975 was approximately $8,000 per year, whereas the estimates submitted for the previous years averaged $1,837 a year.

Claro states that Annex "J" constituted an account, as he could best produce it, of what the Williams place produced from 1956 through 1973. It shows an income for that period of $157,889.50, or $8,771.62 per year. .

Annex "K" indicates a smaller income from the Williams place, but, inasmuch as we are inclined to accept Annex "J" as the best evidence of the Williams place income for the period indicated, we find no substantial discrepancy between the actual earnings of the estate in 1974 and 1975 and the indicated earnings for the prior 18 years.

5. The trial court correctly determined that the forgiveness of Margery Smith's debt of approximately $29,000 constituted no basis for valuing the appellants' shares of the estate.

As previously stated, the estate inventory included an indebtedness owing from Margery Smith and Ted Smith, her husband, in the amount of $28,419.57, which was appraised as having no value. This appraisement was later accepted by the State Inheritance Tax Division.

In 1957 or 1958, Clem Bergevin entered into a settlement agreement with Margery by which she agreed to give up all rights to a share of the Emma May Bergevin estate in return for a cancellation of the said indebtedness.

Appellants now urge that the forgiving of this indebtedness should be considered by the court as fixing the value of, or at least indicating a basis for evaluating, the shares of the other heirs.

There are several reasons why this contention is not sound. First, only one–half of the indebtedness would be owing to the estate, as it grew out of a loan from both mother and father to their daughter. Second, the debt was appraised in the estate as having no value. Third, there is no evidence that the debtors were financially able to pay the debt or any part of it. Fourth, the forgiveness of the debt added nothing to the assets of the estate, but, on the contrary, actually increased the value of the shares of the other heirs.

We conclude that the trial court properly disregarded the cancellation of the Margery Smith debt as having no effect upon the value of appellants' shares of the estate. The only evidence presented that offers any solution toward a determination of the earnings of the estate is that presented by the respondent. Unsatisfactory as it is, we accept it as the best evidence before us. We agree with the trial court that "[t]he petitioners invite the Court to arbitrarily pick an amount of money which they would receive as heirs in this estate." The court can never act arbitrarily.

We believe, however, that the judgment of the trial court should be amended in the following particulars:

1. The court accepted the mean between the income of $39,472.38 as calculated in Annex "J" and that of $32,150.92 as calculated in Annex "K".

We are in the same position as was the trial court to determine the effect of the two accountings, Annex "J" and Annex "K". In such a case the trial court's findings as to their applicability is not binding upon us. *In re Estate of Larson,* 71 Wn.2d 349, 428 P.2d 558 (1967); *Kremmel v. Schnaufer,* 4 Wn.2d 242, 103 P.2d 38 (1940); *Johnston v. Monahan,* 2 Wn. App. 452, 469 P.2d 930 (1970).

We believe that Annex "J", which is based upon an effort to estimate the Williams place income as it related to the crops raised and the cattle run thereon is more credible than Annex "K", which attempts to determine income merely on the basis of the percentage of acreage farmed on the Williams place as compared to the total acreage farmed.

We therefore accept the figures of Annex "J" as more properly fixing the value of appellants' shares of the estate.

2. The year 1975 is the last year considered by the trial court. The appellants would now be entitled to compensation for 1976 and 1977.

We invite the parties to reach an agreement covering the amounts reasonably owing for these years. If they are unable to do so, the case will be remanded to the trial court for those determinations.

The judgment of the court is therefore as follows:

## 1.

There is personal property in the estate as follows:

| | |
|---|---|
| Personal property | $14,304.47 |
| Less debt | 38,837.01 |
| | –24,532.54 |
| Income, Annex "J" | 39,472.38 |
| Total Personal Property | $14,939.84 |

## 2.

That said personal property should be distributed as follows:

| | |
|---|---|
| 9/16 thereof to the Estate of Clement O. Bergevin | $8,403.65 |
| 7/48 thereof to Claro E. Bergevin | 2,178.73 |
| 7/48 thereof to Claire Spohn | 2,178.73 |
| 7/48 thereof to Mary Armstrong | 2,178.73 |
| | $14,939.84 |

## 3.

To each of the shares of Claire Spohn and Mary Armstrong should be added 7/48 of the actual profits of 1974 and 1975, as shown by Exhibit 10 and Exhibit 11, respectively, as follows:

| | |
|---|---|
| 1974 | $1,183.58 |
| 1975 | 1,280.62 |
| | $2,464.20 |

886

## 4.

In addition, each appellant shall be allowed interest on the $1,183.58 from December 31, 1974, and $1,280.62 from December 31, 1975, to date of payment, at the rate of 8 percent per annum.

## 5.

Also, the appellants are allowed the sum of $1,000 for their attorney's fee in the trial court and $1,000 for their attorney's fee in the Court of Appeals, and the balance of the personal property in the above–entitled estate is distributed to Claro E. Bergevin and the Estate of Clement O. Bergevin, deceased.

## 6.

The real property of this estate is distributed as follows:

An undivided 9/16 to the Estate of Clement O. Bergevin

An undivided 7/48 to Claro E. Bergevin

An undivided 7/48 to Claire Spohn

An undivided 7/48 to Mary Armstrong

Judgment is affirmed as modified.

MUNSON, C.J., and MCINTURFF, J., concur.