IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DAVID L. WILSON and PEGGY A. WILSON, husband and wife, and the marital community composed thereof, | No. 82259-4-I |
| Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| CLAYTON ERICKSON and KAMI ERICKSON, husband and wife, and the marital community composed thereof, | |
| Appellants. | |

CHUN, J. — In 2019, Kami and Clayton Erickson bought property that shares its western boundary with Peggy and David Wilson's property.[1] Two old-growth evergreen trees stand on what the Wilsons claim to be the boundary line between the properties. The Ericksons obtained a survey of their property. According to the survey, one of the trees is mostly on their property and the other is entirely on their property. Clayton informed Peggy that he intended to remove the trees. Peggy objected, asserting that the boundary line runs through both trees and that both sets of property owners owned the trees. The Wilsons petitioned to quiet title, seeking a declaratory judgment that the boundary line runs through the trees, and an injunction prohibiting the Ericksons from "cutting down or destroying" the trees. After a bench trial, the trial court determined that the doctrine of mutual recognition and acquiescence applied and ruled in the

---

[1] For clarity, we refer to the parties by their first names. We intend no disrespect.

Citations and pin cites are based on the Westlaw online version of the cited material.

Wilsons' favor. The court also awarded the Wilsons attorney fees and costs. For the reasons discussed below, we affirm.

## I. BACKGROUND

### A. Facts

The Wilsons have lived on their property in Everett, Washington since 1999. In October 2019, the Ericksons bought the adjacent property. The boundary line between the two properties runs north and south, with the Wilson property to the west and the Erickson property to the east. Two old-growth evergreen trees stand on what the Wilsons claim to be the boundary line between the properties. The Wilson house's foundation runs parallel to the boundary line. In the Wilsons' front yard, south of the house, is a cedar fence that runs north and south, which is roughly aligned with the house. And in their backyard, north of the house, is a chain link fence that runs north and south, which lies about two feet east of the house's foundation and runs to the northern end of the property. At the time of purchase, the Erickson property had a house, a garage, and a shed. After the purchase, the Ericksons hired a company to survey their lot and ascertain the boundary line.

Several months after the Ericksons bought their property, Clayton spoke to Peggy for the first time. He expressed his intent to remove the two old-growth evergreen trees. He asserted he had a legal right to do so because, based on the survey, most of the northern tree is on the Erickson property, and the entire southern tree is on the Erickson property. Peggy says that during this conversation, Clayton said he planned to take down the Wilsons' chain link

fence, which wraps around the trunk of the northern tree on the western side of the trunk. Clayton says he told her he would replace the fence. Peggy told Clayton that the trees mark the property line and objected to their removal.

B. Procedural History

The Wilsons commenced suit, seeking to enjoin the Ericksons from removing the trees. They also requested that the court quiet title to the disputed strip of property and enter a judgment declaring that the boundary line runs through the trees. The Ericksons counterclaimed for partition, a declaratory judgment that the trees are "dangerous," and an injunction prohibiting the Wilsons from interfering with the trees' removal. They later dropped the dangerous trees claim.

At trial, Peggy testified, "It was always understood that . . . the trees were property line markers." And when asked who had that understanding, she responded, "All the owners that were adjacent to the property. This is the first time it's come into question." She said that she spoke with Dorothy Caldwell, one of the prior owners of the Erickson property, about how the "tree line was the property line." Peggy said she and David and prior owners of the Erickson property trimmed their respective sides of the trees without asking for the others' permission and without dispute. She explained that when she and David erected the chain link fence, they purposely placed it about three feet inside the boundary line rather than on it so that they would have access to both sides of the fence for repairs and cutting grass without having to go on the adjacent property. Peggy also expressed concern that based on the Ericksons' survey, their house no

longer complied with the city of Everett's five-foot setback requirement, which they understood applied to their house. She explained to the court that a series of trial exhibits depicted her and David holding 10-foot sticks and ropes marked in the middle at five feet to show that the five-foot point between their house and the garage on the Erickson property bisects the trees. She also said that the corner of a fence on the Crosby property, known as "Crosby corner," represents the northeast boundary point for their property. The court found Peggy credible.

David testified that the boundary line runs through the trees and lies east of their cedar fence. He said that the trees and Crosby corner act as the markers for the boundary line. And he said that the Ericksons' survey also recognizes Crosby corner as the northeast boundary of the Wilson property. David said that they placed the chain link fence three feet west of the boundary line so they could maintain both sides of the fence without encroaching on the neighbors. He said that over the 20 years he and Peggy lived on their property, he did not know of any dispute involving the boundary line. David also explained that when Caldwell owned the Erickson property, the shed on that property extended about four feet closer to the boundary line, and that before she sold the property, she had neighbor Jed Whitley shorten the shed to be in alignment with the garage, which sat about 10 feet from the Wilsons' house. This created an approximately 10-foot-wide corridor between structures on the two properties. The court found David credible.

Jon Iseman, who previously owned the Wilson property after he bought it from his parents in 1996, also testified. He said he understood that, from the

4

time his parents bought the property in 1977, the boundary line ran through the trees and the property owners on each side of the boundary jointly owned the trees. He also testified that years ago, when his father wanted to cut down the trees because they obstructed the view, Caldwell said that he could not unilaterally do so because the boundary line ran through them. From 1977 through 1999, Iseman never heard his father or any adjoining property owner claim that the trees were not on the boundary line, nor did he see or hear any adjoining property owner claim sole possession of the trees. The trial court found Iseman's testimony credible.

Dan Bovey, a broker involved in the sale of the Wilson property to Iseman's parents in 1977, testified that he had over 50 years of experience in real estate and had been involved in about 26 transactions in that neighborhood alone. He testified that the boundary line was east of the Wilsons' chain link fence and cedar fence. He noted that the chain link fence did not line up with Crosby corner, the northeast boundary of the Wilson property. Bovey also noted that boundary line irregularities were not uncommon in the area. He testified that while the current setback ordinance requires property owners build structures five feet away from boundary lines, before the 1980s, the setback requirement was seven and a half feet. During his testimony, Bovey commented, "Well, the trees aren't what designate the boundary line. The trees might be on the boundary line or just inside the boundary line." He did not explain whether "inside the boundary line" meant on the Wilsons' or the Ericksons' side of the boundary. The court found Bovey credible.

5

Brent Eble, the land surveyor the Ericksons hired, testified about the results of his survey. He said that the Wilsons' chain link fence runs roughly along the boundary line and that the Wilsons' house sits two feet and seven inches from that line. He also said the chain link fence ends about two feet west of Crosby corner, and thus two feet west of the surveyed boundary line. Eble testified that the Wilsons' house was eight and a half feet from the Ericksons' garage. He said that during the survey, his crew did not talk to the Wilsons or any other neighbors or predecessors in title about the location of the boundary line, or about any possible occupation or possession. He acknowledged that, despite the existence of a written survey, it is ultimately for the courts to decide and declare legal boundaries. Eble said that he does not rely on setback ordinances to determine boundary lines because no guarantee exists that the property owners follow such ordinances and the requirements can change over time. The court found him not credible.

The Ericksons also testified. Clayton testified that the survey showed that the southern tree was entirely on his property and that the northern tree was mostly on his property. He said that the Wilsons' house was nine and a quarter feet from the Ericksons' garage. Clayton said that he did not ask anybody where the boundary line was, or who owned the trees before he bought the property; he assumed the Wilsons' fence was on or near the boundary line. For the most part, Kami denied knowledge of or involvement in the matter. The court found both Clayton and Kami not credible; it noted that Clayton gave different answers

about how much of the northern tree he owned and found Kami's testimony generally "evasive and combative."

Jed Whitley, a neighbor who lived on the eastern side of the Erickson property from 1966 to 2017, testified. He said that he recalled the boundary line being along an old fence, which no longer exists, and along a concrete "wall," which sits about five feet from the garage and that "the trees and the hedges and everything kind of lined up that way." Whitley said no one ever discussed the boundary line with him. But he also stated that before the Ericksons, there was never any dispute about the boundary line, and everyone got along. He denied being the one to shorten the shed and said it happened after the sale of the property to Su Chang, the person who owned the property before the Ericksons. The court found Whitley not credible.

Several other witnesses testified, including: arborists; an architect; and Daryl Johnson, who lived at the Wilson property in 1957 when his father, Lee Johnson, moved their house closer to the boundary line to where it now sits. Johnson testified that no one told him the location of the boundary line and he did not recall where it was. The court also conducted a site visit.

After trial, the trial court concluded the doctrine of mutual recognition and acquiescence applied and declared the boundary line starts at the south end of the property and lies five feet east from, and parallel to, the Wilsons' house, and runs north through the two trees and ends at Crosby corner. The court permanently enjoined the Ericksons and their successors from "cutting down or destroying" the trees. The court declared that each set of property owners owns

7

fifty percent of the trees as tenants in common. And the court awarded the Wilsons attorney fees and costs. The Ericksons appeal.

## II. ANALYSIS

### A. Preliminary Issues

The Wilsons make the following preliminary arguments: (1) the Ericksons violated RAP 10.3(g) and 10.4(c), (2) the assignment of error challenging credibility determinations is unreviewable, (3) the assignment of error challenging the court's findings of fact is unreviewable as it is unsupported by citation to authority, and (4) the Ericksons failed to preserve their challenges below. We reject these claims and address the merits.

#### 1. RAP violations

The Ericksons did violate RAP 10.3(g) and 10.4(c). RAP 10.3(g) requires an appellant to make a separate assignment of error "for each finding of fact a party contends was improperly made." And RAP 10.4(c) provides, "If a party presents an issue which requires study of a . . . finding of fact, . . . the party should type the material portions of the text out verbatim or include them by copy in the text or in an appendix to the brief." The Ericksons placed all their challenged findings in one assignment of error and did not include the text of the findings verbatim or in an appendix to their opening brief. They did include the court's findings in an appendix to their reply brief.

Though the Ericksons violated these RAPs, we conclude that the violations do not preclude our review. RAP 1.2(a) instructs appellate courts to "liberally" interpret the rules to "facilitate the decision of cases on the merits."

8

And when, as here, "'the nature of the appeal is clear and the relevant issues are argued in the body of the brief . . . , there is no compelling reason for the appellate court not to exercise its discretion to consider the merits of the case or issue.'" State v. Kinneman, 120 Wn. App. 327, 342, 84 P.3d 882 (2003) (quoting State v. Olson, 126 Wn.2d 315, 323, 893 P.2d 629 (1995)).

2. Credibility determinations

The Wilsons say the Ericksons improperly challenge the trial court's credibility determinations. See Russell v. Dep't of Human Rights, 70 Wn. App. 408, 421, 854 P.2d 1087 (1993) ("Credibility determinations are for the trier of fact, not the appellate court, and they will not be reversed on appeal."). The Ericksons respond that they do not challenge the trial court's credibility determinations. Instead, they say their argument is, even assuming certain witnesses were credible, their testimony does not meet the required elements of mutual recognition and acquiescence. They correctly characterize their argument. Thus, no such improper challenge precludes our review.

3. Citation to authority

The Wilsons contend that the Ericksons failed to support their assignment of error challenging the court's findings with citation to authority and such failure precludes this court's review. The Ericksons do not respond. We reject this argument as the Wilsons fail to cite law supporting the contention that assignments of error challenging findings of fact as unsupported by substantial evidence—an inherently factual inquiry—must be supported by citation to legal authority. Moreover, the Ericksons do cite multiple cases in their briefing.

9

4. Waiver

The Wilsons say that the Ericksons waived any challenge to the trial court's findings of fact by failing to object to them below or file a motion for reconsideration. Thus, they contend, all the findings are verities on appeal. The Ericksons respond that they did not need to object below to preserve their appeal. We agree with the Ericksons. See State v. Coleman, 6 Wn. App. 2d 507, 522, 431 P.3d 514 (2018) ("An appellant is not required to object at trial to findings of fact in order to preserve a challenge to the sufficiency of the evidence."); see also CR 46 ("Formal exceptions to rulings or orders of the court are unnecessary").

B. Mutual Recognition and Acquiescence

The Ericksons say the trial court erred by concluding the doctrine of mutual recognition and acquiescence applied here. We disagree.

We review a trial court's findings of fact to determine whether substantial evidence supports the findings. Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). "Evidence is substantial if it is sufficient to persuade a fair-minded, rational person of the declared premise." Id. "A reviewing court may not disturb findings of fact supported by substantial evidence even if there is conflicting evidence." Id. We then determine whether the findings support the conclusions of law. Green v. Hooper, 149 Wn. App. 627, 641, 205 P.3d 134 (2009). Unchallenged findings are verities on appeal. Merriman, 168 Wn.2d at 631.

Certain doctrines, such as mutual recognition and acquiescence or adverse possession, can establish a boundary different from the surveyed line. Lamm v. McTighe, 72 Wn.2d 587, 591, 434 P.2d 565 (1967) ("Boundaries between adjoining properties, at odds with the true boundary as revealed by subsequent survey, may be established, under appropriate circumstances, through" adverse possession and mutual recognition and acquiescence, among other doctrines). Here, the Wilsons do not dispute the accuracy of the survey. The issue is whether the boundary line has shifted through mutual recognition and acquiescence. To prevail on a claim of mutual recognition and acquiescence, a party must prove

> (1) that the boundary line between two properties was "certain, well defined, and in some fashion physically designated upon the ground, *e.g.,* by monuments, roadways, fence lines, etc."; (2) that the adjoining landowners, in the absence of an express boundary line agreement, manifested in good faith a mutual recognition of the designated boundary line as the true line; and (3) that mutual recognition of the boundary line continued for the period of time necessary to establish adverse possession[.]

Merriman, 168 Wn.2d at 630 (quoting Lamm, 72 Wn.2d at 593).[2] The party asserting the application of the doctrine bears the burden to show the elements by clear, cogent, and convincing evidence. Id. "To meet this standard of proof, the evidence must show the ultimate facts to be highly probable." Id. at 630–31.

1. Certain, well-defined line

The Ericksons say that no evidence establishes a certain, well-defined line physically designated on the ground. We conclude that substantial evidence

---

[2] The Ericksons do not contend that the Wilsons failed to prove the doctrine's third element, time. Thus, we need not address the Wilsons' argument on this issue.

supports the challenged findings of fact related to the issue and that the court's findings support its conclusion that a certain, well-defined line exists.

Substantial evidence supports the challenged findings of fact related to the existence of a well-defined line. Finding 15 states that Iseman understood "that the common property line between the adjoining lots goes 'straight through' the two big Evergreen trees." Iseman's testimony directly supports this finding. Finding 18 states, in part, "An old metal pipe, described as a side line boundary marker is still embedded in the foot of the most northerly tree."[3] Bovey's testimony and a photograph of the pipe support this finding. Finding 36 states

> Dave Wilson testified at trial. The court found him to be credible. . . . The Wilsons' house is required to have a 5 foot set back from the property line, and he measured the distance between his foundation and the beam remnants of the western wall of the garage on Erickson's property, and found the total distance to be 10 feet. Sighting north along the reputed boundary line at the 5 foot mark between the properties, the line goes straight through the Evergreen trees as shown in the exhibits admitted into evidence.

Bovey's testimony about the setback, David's testimony about the boundary line, and photographs of the disputed area support this finding.

The court's findings of fact about the trees,[4] the pipe, Crosby corner,[5] and the setback corridor support its conclusion that a certain, well-defined line existed between the properties.

---

[3] While substantial evidence supports this portion of Finding 18, as discussed below, such evidence does not similarly support the other portion.

[4] Unchallenged Finding 2 states, "two 'old growth' Evergreen trees located on or near" the surveyed line.

[5] Unchallenged Finding 6 states, "The parties and witnesses all agree that the southeast corner of the 'Crosby' lot is recognized as being on the property line. The Crosby lot . . . is the corner of the Wilson's north boundary, and the Erickson's west boundary."

The Ericksons say that, though Iseman testified that the boundary line runs through the trees, he identified no other monuments designating the line, particularly where it begins and ends. Though the trees alone might suffice to designate a certain line, evidence presented at trial also identified Crosby corner, the old pipe, and the corridor between structures. The Ericksons say that the trees are not aligned with each other but present no support for the contention that the boundary line must be straight.[6]

The Ericksons liken this matter to certain cases in which courts held that no certain, well-defined line existed. These cases are distinguishable.

In Green, 149 Wn. App. at 631, 642–43, the Court of Appeals reversed the trial court's ruling applying the doctrine of mutual recognition and acquiescence, holding that insufficient evidence supported a finding that a certain, well-defined line existed. The court noted, "[T]here are no monuments, roadways, or fence lines along the shorelands boundary claimed by the Greens, except for the railroad tie retaining wall extending into the beach area just south of the Hoopers' upland lot, and situated entirely within the Hoopers' property." Id. at 642. Here, monuments designate a line on the ground: there are two trees in a row, a fence corner, a pipe, and a corridor between structures.

---

[6] The Ericksons also contend that Johnson and Bovey did not testify that the property line runs through the trees and that Iseman's testimony alone cannot support the court's ruling. This argument is better characterized as a reason why mutual recognition and acquiescence did not exist. This is because Iseman's testimony was about the understanding that the boundary line ran through the trees, not about whether any such line was certain and well-defined. An understanding of the location of a boundary line relates more to the mutual recognition of such line. Thus, this opinion addresses that argument below.

13

In Merriman, 168 Wn.2d at 632, our Supreme Court affirmed a trial court's ruling that the doctrine did not apply. The court held that "three widely spaced markers in this case, set in a thicket of blackberry bushes, ivy, and weeds, did not constitute a clear and well-defined boundary." Id. The court stated, "[W]here the disputed area is overgrown, more than isolated markers are required to prove a clear and well-defined boundary." Id. at 631. Here, the Ericksons do not contend that the disputed area is overgrown, nor does it appear so from the record. The markers can be seen such that one can look down the line and understand where the boundary lies.[7]

2.  Manifestation of mutual recognition and acquiescence

The Ericksons next contend that no evidence showed that the acquiescence between property owners was mutual. The Wilsons say that their

---

[7] The Ericksons also cite Scott v. Slater, 42 Wn.2d 366, 255 P.2d 377 (1953), in which a party claimed a boundary line ran along the edge of a since-removed street. A row of trees ran along the edge of the claimed line. Id. at 367. The court reversed the trial court's ruling applying mutual recognition and acquiescence, finding a lack of a "mutually select[ed]" line because the parties' "cultivation of the strip did not terminate at a well-defined point and varied in its extent." Id. at 368. But this old case intermingles the separate questions of mutuality and a certain, well-defined line, and does not state that a row of trees could not suffice as a certain, well-defined line.

The Ericksons also cite Johnston v. Monahan, 2 Wn. App. 452, 469 P.2d 930, review denied, 78 Wn.2d 993 (1970), but there the court applied the doctrine of parol agreement not mutual recognition and acquiescence. And they cite Waldorf v. Cole, 61 Wn.2d 251, 256, 377 P.2d 862 (1963); but there, the court, while noting that a pile of rocks did not constitute a certain line, decided the case based on the lack of mutuality.

The Ericksons also distinguish this case from a series of cases affirming a finding of a certain line. See Lilly v. Lynch, 88 Wn. App. 306, 317, 945 P.2d 727 (1997) (holding a certain line existed based on a boat ramp and concrete bulkhead); Mullally v. Parks, 29 Wn.2d 899, 190 P.2d 107 (1948) (holding that a split rail fence and barbed wire fence was a certain line); Lamm, 72 Wn.2d at 593 (holding that a fence built with the understanding that it would designate the boundary line was a certain line). But these cases do not purport to announce a minimum for what constitutes a certain and well-defined line.

14

actions and the actions of their predecessors combined with the actions of the Ericksons' predecessors show a high probability that the respective property owners mutually recognized and acquiesced to the boundary line running through the trees. We conclude that—with one exception—substantial evidence supports the findings of fact on the issue; and, absent that exception, the court's findings support the court's conclusion of law on the manifestation of mutual recognition and acquiescence of the boundary line.

Property owners can manifest mutual recognition and acquiescence "'by their acts, occupancy, and improvements with respect to their respective properties.'" Lilly v. Lynch, 88 Wn. App. 306, 316–17, 945 P.2d 727 (1997) (quoting Lamm, 72 Wn.2d at 593.). "Acquiescence in a property line cannot be established by the unilateral acts of one party." Heriot v. Lewis, 35 Wn. App. 496, 501, 668 P.2d 589 (1983).

The Ericksons contend that the evidence shows that only the Wilsons and their predecessors recognized and acquiesced to the boundary line running through the trees. They say that no evidence shows that the recognition and acquiescence was mutual—that any of their predecessors agreed the boundary ran through the trees. We disagree.

Peggy said she spoke with Caldwell about how the "tree line was the property line." Peggy also said she and David and the prior owners of the Erickson property trimmed their respective sides of the trees without asking for permission from the owners of the other property and without dispute. Iseman said that when his father wanted to cut down the trees, Caldwell told him he

could not unilaterally do so because the boundary line ran through them. And David testified that when Caldwell owned the Erickson property, the shed on that property extended about four feet closer to the boundary line, and that before she sold the property, Caldwell had Whitley shorten the shed to align with the garage, which sat about 10 feet from the Wilsons' house.

The Ericksons emphasize that Johnson and Bovey did not testify that the boundary line runs through the trees and that Iseman's testimony alone does not suffice to support the court's ruling. But that ignores Peggy and David's testimonies; and they had owned their property for about two decades when this dispute arose.

The Ericksons rely on Muench v. Oxley, 90 Wn.2d 637, 641–42, 584 P.2d 939 (1978), overruled by Chaplin v. Sanders, 100 Wn.2d 853, 676 P.2d 431 (1984). There, the court held that there was "no evidence" that a property owner's predecessors recognized a boundary line when the only testimony on the matter was a prior tenant who said he was "unaware of any controversy as to the boundary location." Id. at 641. In so holding, the court reversed the trial court's application of the doctrine of mutual acquiescence. Id. But here, Iseman and the Wilsons testified about Caldwell's actions and statements showing mutuality in addition to testifying that no disputes existed before the Ericksons arrived.

Substantial evidence supports nearly all the challenged findings of fact relating to mutual recognition and acquiescence. Finding 13 states,

For more than 20 years all of the Wilsons' interactions and conversations with all previous owners of [the Ericksons' property] have been consistent with their understanding of the reputed boundary line. Wilsons did not have to obtain any permission to trim limbs from their side of the trees, and no adjoining property owner told them they could not. Wilsons did not tell any owner of the adjoining lot that they could not trim their side of the trees. This evidence was not rebutted.

Peggy's testimony supports this finding.

Finding 15 states,

Jon Iseman's understanding is that the common property line between the adjoining lots goes "straight through" the two big Evergreen trees. He did not see or hear where another neighbor unilaterally cut down a tree along the line. He understood that no property owner was supposed to cut down any tree remaining on the line without the consent and permission of the adjoining property owners, and that all adjoining property owners agreed and recognized that the trees sit on the property line and that 100% approval would be required from both lot owners to cut down the trees. Conversations with neighbors confirmed this understanding. This evidence was not rebutted.

Iseman's testimony supports this finding.

Finding 18 reads, "Mr. Bovey states that the reputed property line between the lots is straight through the two Evergreen trees, and that the trees have the reputation of being the boundary line between [the two properties]." While Bovey did say the boundary line was further to the east than the surveyed line, he never explicitly stated that the boundary line runs straight through the trees. Instead, he said, "Well, the trees aren't what designate the boundary line. The trees might be on the boundary line or just inside the boundary line."

Finding 23 states,

The west wall of a light green shed, located between the green garage and the house, did not align with the west walls of the garage and house, but extended approximately 4 feet towards the Wilson's house foundation in the vicinity of the round concrete core and bricks.

In 2014, the extended west wall of the shed was shortened 4 feet away from the Wilson property and put into alignment with the west walls of the garage and house on [the Ericksons' property].

David's testimony and photographic exhibits support this finding.

Finding 36 states,

Dave Wilson testified at trial. The court found him to be credible. According to Dave adjoining neighbors have never claimed to be the sole owners of the trees. His historic interactions and conversations with them are consistent with the trees being part of the common boundary line, and that the trees have always had the reputation of being on the common boundary line. As such, it is his view that this set of facts requires 100% of the property owners be in agreement before any tree along the boundary line can be cut down. . . . Over the 20 years Wilsons have lived on their property, there have never been any disputes involving the trees or the boundary line.

David's and Peggy's testimony support this finding.

Finally, Finding 38 states,

In viewing all of the photos of the property, entered as exhibits, it is clear that there is a pattern of practice or activity that creates an approximate 10-foot wide corridor between the homes. By way of inference, this result implies that everyone affected <u>acted in recognition</u> of this common, perhaps even community, understanding. And we know from testimony that this understanding has not been disturbed for over twenty years. The two trees reside within this boundary and their historic undisturbed state is also proof of this community understanding.

(Emphasis in original.) Peggy's testimony and photographic exhibits support this finding.

Apart from the unsupported portion of Finding 18, the trial court's findings of fact support its conclusions that owners and predecessors in interest of the two properties mutually recognized and acquiesced to the boundary line running

18

through the trees. The findings about the lack of dispute,[8] the common understanding of where the line runs, the setback corridor, and joint ownership of the trees[9] support this conclusion. The unsupported portion of Finding 18—about Bovey's testimony—is not determinative. As a person who never had an ownership interest in either property, Bovey's understanding, or lack thereof, of the boundary line is less pertinent to the mutuality inquiry. And he did not specify which property he believed the trees were on when he said, "inside the boundary line." Thus, contrary to the Ericksons' contention otherwise, this comment does not support either party's position.

### 3. Setback evidence

The Ericksons say the Wilsons' setback evidence does not support the court's mutual recognition and acquiescence findings. They contend that the Wilsons relied on setback evidence to argue that because their house would violate the setback ordinance as currently located in relation to the surveyed line, the boundary line must be further east than the surveyed line and run down the middle of the corridor between structures on the two properties. The Ericksons

---

[8] Unchallenged Finding 4 states, "The [Ericksons] obtained title to their lot on October 1, 2019. Before then, there were no disputes or threats between or among the Wilsons and the predecessors in title of both lots."

[9] Unchallenged Finding 35 states,

Dorothy Caldwell, a predecessor in title to Erickson, asked Peggy Wilson to please not cut down any trees on the property line as an earlier owner had done and left a stump that can still be seen today. Caldwell did not command that Wilsons do anything with the trees. Caldwell did not claim that the trees were hers. After Caldwell sold the property to Chaing [sic] [Chang above], Chaing asked to prune the trees and the Wilsons agreed she could do that. . . . There had never been a dispute over [the Wilsons'] chain link fence, or the trees, or the reputed boundary line with any of the owners until Ericksons raised them in April of 2020.

19

contend that this setback-based argument lacks merit. The Wilsons do not respond. We conclude that the setback evidence supported the trial court's ruling.

Johnson testified that at some point in the 1950s, his father moved the Wilsons' house closer to the boundary line between the two properties to where the house now sits. Bovey testified that though the current setback ordinance requires property owners build structures five feet away from boundary lines, before the 1980s, the setback requirement was seven and a half feet.

The Ericksons say that the Wilsons used the setback evidence to argue that the property owners' predecessors in interest must have agreed that the boundary line runs straight down the middle of the corridor between the Wilsons' house and the structures on the Erickson property. The Ericksons contend that this argument is not tenable because the setback ordinance was seven-and-a-half feet when Johnson's father moved the house towards the Erickson property. They note that such a setback ordinance, if followed, should create a corridor of 15 feet between the structures on the adjoining properties and that because the distance between the structures is not even 10 feet, someone had to have violated the setback ordinance. They cite Bovey's testimony in which he concedes that under the old, seven-and-a-half foot setback requirement, one of the predecessors in interest must have violated the setback. 9/30/20RP 64–65.

But even if the placement of the Wilsons' house does not lend itself to a conclusion of mutual recognition and acquiescence, the later maintenance of an

approximately 10-foot-wide corridor between structures does. As the trial court said,

> [T]he occupants on both sides of the boundary line have taken pains to reference and maintain this line in order to maintain the corridor, in this case, required by the five-foot setback. . . . [W]hen one side built a shed that encroached upon the corridor, when time came to resell the property, the shed was restructured so that its wall aligned strictly with the corridor's edge.

The Ericksons emphasize that Eble, the surveyor, testified that the Wilsons' house was only eight and a half feet from the structures on the Erickson property. But even if one or both property owners violate the setback ordinance, that does not necessarily mean the owners and their predecessors did not mutually recognize and acquiesce to a boundary line running through the trees and down the middle of the corridor. Moreover, Clayton testified that the gap was nine and a quarter feet and the Wilsons testified about using a 10-foot stick to measure the half-way point between their house and the garage on the Erickson property and introduced exhibits depicting such measurements.

The Ericksons also point to Eble's testimony in which he stated that he never relies on setbacks when surveying a boundary line. But what a professional surveyor looks at to determine a boundary line differs from what a court looks at to determine mutual recognition and acquiescence.

Finally, the Ericksons say that no evidence shows that their predecessors knew the Wilsons' house violated the setback ordinance and agreed to adjust the boundary line accordingly. But they cite no law indicating that such knowledge is

required for the Wilsons to prevail in a mutual recognition and acquiescence action.

C. Attorney Fees

The Ericksons base their challenge to the trial court's award of attorney fees and costs solely on the contention that they should have prevailed below. They offer no other grounds to challenge the award. Because we conclude the trial court did not err in ruling for the Wilsons, we reject the Ericksons' argument.

The Ericksons also request that we award them attorney fees and costs on appeal and at the trial level solely on the ground that they should prevail on the merits of the case. Because we affirm the trial court's ruling, we reject the request.

We affirm.

Chun, J.

WE CONCUR:

Bowman, J.          Appelwick, J.